BISCOE *v.* DEMING INVESTMENT COMPANY.

Opinion delivered May 16, 1921.

1.  BROKERS—UNILATERAL CONTRACT.—A contract authorizing a broker to negotiate a loan on lands on specified terms for designated compensation, without obligating the broker to render any service in procuring the loan, was unilateral and could not be enforced unless the broker performed the service which it was employed to render.

2. BROKERS—RIGHT TO COMMISSION.—Where a real estate broker employed to procure a loan on lands procures a person who is ready, able and willing to make the loan on the specified terms, and the owner refuses to accept the loan, the broker is entitled to his commission.

3. BROKERS—ESCROW AGREEMENT—EVIDENCE.—In a broker's action for compensation for procuring a lender, ready, able and willing to make a loan, on failure to consummate transaction because of owner's refusal to deliver papers to be recorded prior to delivery of the proceeds of the loan to a depositary in compliance with an escrow agreement, evidence *held* insufficient to prove that the broker's agent was without authority to bind the broker by such agreement.

Appeal from Prairie Chancery Court; *John M. Elliott*, Chancellor; reversed.

*Moore, Smith, Moore & Trieber*, for appellants.

1. The contract sued on was void for want of mutuality. 96 Ark. 184-5; 21 So. 233; 44 N. W. 669; 102 Ark. 621-624; 100 *Id*. 510-14; 124 *Id*. 354-9; 30 *Id*. 186-194.

2. Appellee did not procure a lender on the terms required by the contract. 4 R. C. L. 303. Before a broker is entitled to his commission, he must produce a purchaser ready, able and willing to purchase and able to purchase on the terms and price designated by the principal. 27 Pac. 882-3; 4 So. 180; 9 N. W. 784; 1101 N. W. 719-21; 83 N. Y. 378-382-3; 92 N. W. 413.

3. The law, as well as the express provisions of contract, required appellee to notify appellant of the acceptance of the loan. The broker must produce the customer, ready, willing and able to take the property on the terms stipulated, and the broker must perform the duties assumed within the time limit of the contract. 99 Pac. 867; 46 N. W. 673; 67 *Id*. 1148; 94 Am. Dec. 541-3; 9 N. W. 784-5; 29 N. E. 154.

The contract is unilateral and void for want of mutuality. The time had been extended, and appellee given every opportunity to procure a customer. 83 N. Y. 378, 382-3; 112 Ark. 227-232.

4. The agency was terminated. Parol evidence was admissible to show that a written contract was executed upon the condition that certain changes were to be made in the writing before it should become the real agreement of the parties. 88 Ark. 383; 98 *Id.* 10-12.

Parol proof is admissible to show that certain sureties signed upon condition that the bond should be signed by certain other sureties 57 Ark. 64, 78; 78 *Id.* 588; 82 *Id.* 225; 76 *Id.* 140-2.

If the copies relieved appellee of the application and the loan contract were not corrected through the neglect of appellee's stenographer, this case falls within the rule in 135 Ark. 609.

The effect of the extensions agreed on was to limit the agency to the period of time named in each of them. No action on the part of appellant was necessary to the termination of the agency. The authority of appellee expired *ipso facto* at the expiration of the period of extension. 112 Ark. 227, 232.

The escrow agreement of May 3, 1915, was entered into to keep alive and extend the agency which expired on that day and giving appellee further time to discharge its duties as agent. The deposition of Mr. Deming is not of persuasive force and is inconsistent with his attitude and the statements in his first deposition, and he by his acts and conversations ratified Long's acts.

When an alleged principal accepts a partial benefit from the act of an agent, he will be held to have ratified the agent's authority throughout. He can not repudiate in part and ratify in part, but must repudiate or ratify the entire transaction. 114 Ark. 12. Any evidence is competent which tends to establish the agency. 93 Ark. 603. It is permissible always to prove a previous course of dealing. 21 R. C. L., p. 820, 855, par. 34.

If the escrow agreement is void for want of authority in Long, the agency of plaintiff was terminated, and it has no right of action.

*Trimble & Trimble, Cooper Thweatt* and *Coleman, Robinson & House,* for appellee.

Only a question of fact is involved, and the evidence clearly sustains the decree, and no reason is shown for reversal.

WOOD, J.   During the year 1915 the Deming Investment Company, hereafter called appellee, was engaged in the business of negotiating loans on farm lands in Arkansas.   On the 8th day of March, 1915, John E. Biscoe and Elizabeth Biscoe, hereafter called appellants, executed and acknowledged an instrument addressed to the appellee, the material parts of which are as follows:

"I hereby appoint you my agent to negotiate and procure for me a loan of $70,000 on seven years' time, bearing interest at the rate of six per cent. per annum, payable semi-annually on the first day of November and May in each year to be secured by first mortgage on land hereinafter described.   (The description of the land in Lonoke and Prairie counties is then set forth.)

"As compensation for your services in negotiating this loan, I hereby agree to pay you or the assignee of this contract, the sum of $9,800, payable in four notes, as follows:   (Here follows a description of the notes and a statement that they were to be secured by second mortgage on the lands herein described, and a statement that the appellants would pay all expenses incident to procuring abstracts of title and recorder's fee.)

"For value received, I do hereby promise and agree to pay such actual expenses as you may have incurred in the negotiation of the loan and examination of the property and title, if I do not obtain said loan by reason of defects in my title, or by reason of my being unable to remove all incumbrances from said land; and if you or any negotiator to whom you apply for me for above loan, notify me of acceptance of said loan, and I am unable to or refuse to complete the said loan, then I agree to pay five per cent. on amount of loan applied for, and all ex-

penses you or the assignee of this contract have incurred for such refusal or inability to complete said loan.

"It is understood that the lender to whom you apply shall have the right to impose all reasonable requirements and conditions in making said loan, and I do hereby authorize you or the assignee of this contract to receive all money due me on said loan and further authorize you or the assignee of this contract to pay off all incumbrances, leases, and liens of every kind on my said land, and pay for insurance, taxes on land, expenses of loan, and any other money necessary to be paid to perfect title to said land or any part thereof. And if the loan hereby applied for should not be sufficient to pay off all liens, I agree to pay the deficiency within ten days after said note and mortgage are executed. And if said land is rented or under lease, either verbal or written, at the time the loan applied for is closed, or if said premises are occupied by any other person or child over legal age, I agree to obtain and deliver to you the written disclaimer of said tenant or person in favor of lender. (Then follows provisions for insuring the buildings on the real estate and a provision for paying the expense of perfecting title to the property, if same should be found defective). And the lender may remit you or the assignee of this contract all money due me on said loan for disbursement or may remit to you part of said money and retain a portion of the same to pay off incumbrances as may be necessary to be paid to perfect my title and this shall be authority to you for the assignee of this contract to receive and disburse all moneys due me on said loan.

"It is also agreed that your authority to negotiate said loan shall be irrevocable for thirty days after I shall have furnished you complete and satisfactory abstract of title, showing perfect title in applicant.

"As security for the payment of any and all sum or sums of money to which you may be entitled under this contract, I hereby pledge and mortgage to you the above described real estate."

This action was instituted by the appellee against the appellants. The appellee alleged the execution of the above instrument and attached a copy as an exhibit and made it a part of its complaint. Appellee alleged that appellants, by the instrument, mortgaged to the appellee the lands described to secure the appellee in any sums of money that appellants might be entitled to under the contract. It alleged that under the terms of the contract it proceeded to negotiate a loan for appellants in the sum of $70,000 and did procure a client ready, willing and able to make said loan; that the appellants refused to accept said loan, and that the failure to complete the loan was due solely to the refusal of the appellants to complete the same under the terms of the contract. The appellee further alleged that they had incurred expense under the contract in the sum of $146.60, and that by reason of the breach of the contract on the part of the appellants it was due the appellee the sum of $3,500 and the amount of the expense above set forth, for which amounts it prayed judgment and that a lien be declared and foreclosed on the lands described.

The appellants answered, admitting the execution of the instrument, but denied that same created a lien on the lands described, and denied that appellee procured the money that was to be advanced on the loan in compliance with the agreement. They averred that, because of the failure of the appellee to furnish the money after repeated demands of appellants, the latter called the transaction off and on May 3, 1915, revoked the appellee's authority. They further alleged that an agreement was then made by which the notes and mortgage executed to secure the loan should be deposited in escrow to be delivered to the appellee by the 15th of May, provided the appellee should place the amount of the loan to appellants' credit on or before that date; that the appellee failed and refused to carry out the agreement, and the escrow agreement ceased to be operative; that the failure to carry out the contract was wholly the fault of the ap-

pellee. The appellants also alleged in their answer, which they made a counterclaim, that the contract sued on had been filed in the offices of the recorders of Lonoke and Prairie counties for the purpose of creating an incumbrance upon appellants' property and beclouding their title, and they prayed that the same be canceled.

The appellee is a Kansas corporation having its home office at Oswego and is engaged in business in this State. Robert C. Deming was the president and general manager of the company. During the year 1915 and at the time the instrument upon which this suit was based was executed, M. B. Long was in charge of the appellee's business in Arkansas. His authority was to take applications and contracts for farm loans in the State, to make inspections of property and report upon the securities for the loans offered, submitting his data to the home office for approval, and, if approved, to proceed with the completion of the loan under directions from the home office.

The appellee, under the authority of the above instrument, made application for a loan to the John Hancock Mutual Life Insurance Company of New York, and on April 23, 1915, the appellee wrote to its local agent, Freed Hutto, at England, Arkansas, to the effect that it had received his letter of April 20 in regard to closing the Biscoe loan; that the appellee was awaiting the decision of the insurance company and stating that action would probably be taken by the finance committee of that company that day, and further stating: ''All we can do is to wait on their movements, but certain that it will be hurried forward as rapidly as they can.'' This letter was sent by Hutto to Biscoe.

On April 23, 1915, the insurance company wrote the appellee the following letter: ''The John E. Biscoe loans for $45,000 on 2,036.38 acres in Lonoke County, Arkansas, and $25,000 on 1,818.32 acres in Prairie County, Arkansas, have been recommended for approval by Mr. Hopkins, and they have now been accepted by the committee

of finance, both for seven years and at 6¾ per cent. interest rate. We await receipt of the completed papers.''

There is no testimony in the record that this letter written by the insurance company to the appellee was sent to the appellants or that the appellants were advised of its contents. The appellee wired its local agent, Long, to the effect that the Biscoe loan was approved by the insurance company, and that the papers were in Little Rock to be executed. It appears that this telegram was received by the agent while he was at Brinkley. With Long at the time was one Mr. Self, who had been appointed by the company as local agent and general manager of appellee's business in Arkansas in place of Long, and who was to take charge of appellee's business on the first of May, 1915. After receiving the telegram, Long and Self proceeded to Little Rock and finished up there on the last of April. On the next day, which was Saturday, May 1, Self went to England to see Biscoe to have him sign the papers for the loan. Biscoe informed Self that he wanted to take the matter up with Horace Chamberlin, his attorney and agent, and would be in Little Rock Monday to get the papers signed. On Monday morning, May 3, the appellants and Chamberlin, Long, Mitchell and Hutto, met in appellee's office in Little Rock. Long had the notes and mortgages that were to be executed by the appellants in triplicate. One on the Lonoke County land for $45,000, one on the Prairie County land for $25,000, and one on the lands in both counties for $9,800, the latter amount representing the commission that was to be paid the appellee for procuring the loan.

Chamberlin suggested several changes in the terms of the mortgages, which were agreed to by Long, and these changes were made, and the mortgages and notes were executed by the appellants. Biscoe asked for the money and Long told him that he did not have it, but that he could have it there in a very few days—by the 10th. Biscoe protested and stated that unless the money were forthcoming on that day he would call the loan off. At

this juncture Chamberlin suggested that the appellants extend the appellee's time for procuring the money until the 15th and on certain terms, to which appellants and Long and the other agents, Hutto and Mitchell, agreed. This agreement was evidenced by the following instrument signed by the appellants, and the papers described therein were placed in escrow in the Exchange National Bank, as evidenced by its receipt:

"May 3, 1915.

"Exchange National Bank, Little Rock, Arkansas:

"Gentlemen: We hand you herewith one note in the sum of $25,000, payable to the Deming Investment Company on the first day of May, 1922, one note in the sum of $45,000, payable to the Deming Investment Company on May 1, 1922, and also one note in the sum of $1,400, payable November 1, 1915, and three notes in the sum of $2,800 each, payable to the Deming Investment Company on November 1, 1916, 1917 and 1918, respectively. We also inclose herewith a mortgage by John E. and Elizabeth K. Biscoe on Lonoke County land in the sum of $45,000 to secure the aforementioned note; also a mortgage by the same parties in the sum of $25,000 on Prairie County lands to secure the aforementioned note for $25,000. We also hand you herewith a mortgage executed by the same parties on Lonoke and Prairie counties lands in the sum of $9,800, being given to secure the aforesaid notes aggregating $9,800.

"Should the Deming Investment Company place to our credit in your bank on or before May 15, 1915, the sum of $70,000, or should we hand you by said date our acknowledgment in writing of receiving the sum of $70,-000 from the Deming Investment Company, you will kindly deliver the aforementioned papers to the Deming Investment Company, or its agent.

"Very truy yours,

"Received the above-mentioned papers to be held as requested."                          "Exchange National Bank,
                    "By W. B. Kennedy, Asst. Cashier."

On the next day, May 4, Deming arrived in Little Rock and told Chamberlin that it would be necessary to have the mortgages filed for record and the abstracts re-dated to cover such filing before he could pay out the loan proceeds. Chamberlin would not consent to this. The appellee, through Deming and Self, insisted on it, stating that it was absolutely necessary to file the mortgages before payment; that it was the usual and customary method of closing loans. They appealed to Biscoe and stated that Biscoe yielded to their request and promised that he would write to the Exchange National Bank and to Chamberlin instructing that the mortgages be delivered to the appellee that they might be recorded and the abstracts redated to cover such filing before the money was paid over. Instead of doing so, however, after consulting with Chamberlin, he wrote to the appellee that he had decided to let the matter remain as per the agreement of May 3, 1915.

Deming contended and testified that during the month of May the appellee was ready, willing and able to furnish the appellants the $70,000 as it had agreed to do, and that it exhibited to Chamberlin and Biscoe drafts showing such facts and informed them that the appellee would furnish the cash if appellants so desired; that on May 13, 1915, Deming and Self had an interview with Chamberlin in which the drafts were exhibited to him, and that later on the same day they had an interview with Biscoe and also exhibited the drafts to him; that Biscoe stated that he would see his attorney the next day and take the matter up further with Self at Little Rock; that, instead of doing this, however, he wrote the appellee a letter dated May 13, in which he stated: "Since your Mr. Deming and Mr. Self were here, I had a conversation over the telephone with Mr. Chamberlin, my agent in this deal, and he says you gentlemen were in his office

and the deal was called off, as you would not comply with our agreement of May 3, and I ratify everything he does in the matter.   In view of this, I will not call to see you.''

Chamberlin, in his testimony, flatly contradicted the testimony of Deming and Self as to what took place in their interview with him on May 4.   He stated in substance that, after he refused to consent to turn over the mortgages to the appellee and having informed them that the appellants would expect the appellee to abide by the agreement as to the escrow of the mortgages and notes executed on May 3, 1915, Deming emphatically stated that he would not do so; that on May 13 Deming and Self again interviewed him, and, after exhibiting to him drafts aggregating $69,900, witness asked what was the purpose of their visit.   Deming said: ''I want to see if you will change your escrow agreement.''   Witness replied, ''No, sir; we will not.''   The testimony of the witness as to the conversations he had with Deming and Self at the interviews after the execution of the agreement for escrow is exceedingly voluminous, but the substance of it is that the appellee's agents desired that the appellants modify such agreement, withdraw the mortgages, and turn them over to the appellee so that they might be recorded and shown in the abstracts and the abstracts redated showing that the appellee had a first lien on the property before the money was paid over to appellants; that witness advised appellants not to consent to this, but to stand by the agreement of May 3, and that appellants acted upon his advice and refused to change that agreement.   The last interview was concluded by witness asking Deming and Self if they finally refused to carry out that agreement, and Deming replied, ''Absolutely.   I would not give him a damn dollar unless he does as I want him to do.''   Witness then said, ''All right, sir.   We will just consider this transaction closed, and I will withdraw the papers from the Exchange National Bank.''   Witness did withdraw the papers, marked them canceled, and sent them to Biscoe.

The testimony of Biscoe as to what took place between him and Deming on May 4 and May 13, is also voluminous, but the substance of it is that Deming wanted him to modify the escrow agreement by taking the mortgages from the bank and leaving the notes, which he refused to do. He stated that in the interview on May 13 he did at first tell Deming that he would go to Little Rock and see Self, but after Deming left he had a conversation with Chamberlin over the 'phone in which Chamberlin informed him of what Deming had said to him on that morning, and that after receiving this information he wrote the letter of May 13 in which he told Deming that he ratified everything that Chamberlin did and would not call to see Self.

Both Deming and Self testified that they never had at any time called the loan off, but on the contrary stated in each interview with Chamberlin and Biscoe that they were prepared to close in accordance with the contract, and were desirous of doing so, and demanded the delivery of the mortgages that the transaction might be completed. Deming testified that he did refuse to pay out the proceeds of the loan until the mortgages were filed for record and shown in the abstracts. He also testified that Long's authority to represent the company ended on the last day of April; that Self was employed by the appellee to take Long's place and began his duties on the first of May; that Long had no authority to represent the company on May 3; that the authority of Long and Self was precisely the same. He further testified that neither Mitchell nor Hutto had authority to make contracts like that of May 3, 1915.

Biscoe testified that on May 1 Self told him that he was Long's successor, but that Mr. Long would remain with the company a few days to close up some details with which he was familiar, and that the Biscoe deal was one of them. He and Chamberlin both testified that in the conversation of Deming with them on May 4 Deming did not in any way deny authority of Long to make the escrow agreement.

We have not undertaken to set forth the testimony of the witnesses in detail, as it would unnecessarily extend this opinion to do so. The above statement presents the issues raised by the pleadings and the salient features of the testimony upon which a decree was rendered in favor of the appellee in the sum of $3,646.60, from which is this appeal.

The instrument which is the foundation of this action does not by its terms impose any obligation upon the appellee to render any service to the appellants in procuring the loan mentioned in the instrument. The contract is one purely unilateral, and it therefore can not be enforced unless the appellee performed the service which it was employed to render. See *Grayling Lumber Co.* v. *Hemingway*, 124 Ark. 354; *Eustice* v. *Maytrott*, 100 Ark. 510-514; *El Dorado Ice & Planing Mill Co.* v. *Kinard*, 96 Ark. 184-185.

In the case of *El Dorado Ice & Planing Mill Co.* v. *Kinard, supra*, we said: "Where a party, originally not bound, has executed the contract the doctrine relative to mutuality does not apply." P. 189. The appellee invokes the latter doctrine and contends that it has fully performed the contract by producing a lender who was ready, willing and able to make the loan.

In the case of *Murray* v. *Miller*, 112 Ark. 227-232, this court held: "Where the authority of an agent or broker to sell land is limited to a specified time, he must produce a purchaser ready, willing and able to purchase within the time specified in order to be entitled to a commission on the sale, unless the owner does not act in good faith, or attempts to hinder the broker in making the sale."

We have also held that "where a real estate broker procures a person who is ready, able and willing to purchase the property upon the terms under which the agent is authorized to negotiate the sale and the owner refuses to convey, the agent is entitled to his commission." *Poston* v. *Hall*, 97 Ark. 23. These rules, of course, are ap-

plicable to brokers employed to procure a loan on real estate as well as to brokers who are employed to sell real estate.

Even if the contract contained mutual obligations, by its express terms appellants could revoke the authority of the appellee thirty days after they had furnished appellee abstract showing perfect title. Appellants did not elect to revoke appellee's authority, but, on the contrary, at the request of appellee, continued its authority on the same terms until April 15, again until May 1, and again until May 3. During this time the appellee did not furnish a lender and procure a loan according to the terms of the contract. The contract requires that appellee "notify" appellants "of acceptance of said loan." The insurance company wrote the appellee on April 23, 1915, that the loan had been accepted for seven years at 6¾ per cent. interest, but this communication was not sent to the appellants, and appellants were not notified of its contents. Moreover, even if they had been so notified, the acceptance of the loan was at a rate of 6¾ per cent. per annum, whereas the contract provided that interest should be at the rate of 6 per cent. per annum. Appellee wired its local agent, Long, that the loan had been accepted, but appellants were not notified of this until May 1, and it is not shown that at that time the appellants were advised of the change in the rate of interest.

Therefore, the undisputed evidence shows that on May 3 the appellee had not procured a lender who was ready, willing and able to make the loan according to the terms of the contract. On May 3, 1915, appellants entered into an agreement with the local agent, Long, who assumed to represent the appellee, the terms of which are set forth in the letter of May 3 addressed to the Exchange National Bank. The notes and mortgages executed on that day by the appellants show that appellants had waived the rate of interest provided for in the original contract, and the escrow contract shows that the ap-

pellants again, under the terms of that contract, continued appellee's authority to negotiate the loan until the 15th of May.

The original contract provides "that the lender should have the right to impose all reasonable requirements and conditions in making said loan." If it be conceded that the appellee would have the right under this contract to prescribe as a reasonable requirement that the appellants should turn over to appellee the mortgages for recordation before receiving the proceeds of the loan, nevertheless it is manifest that appellee would have no such right under the terms of the escrow agreement.

It only remains for us to inquire, therefore, whether or not Long was clothed by the appellee with authority to enter into the escrow contract. Deming testified that Long had charge of appellee's business in Arkansas with authority to make applications and contracts for loans. Up to May first he had conducted the negotiations on behalf of appellee for this particular loan. When Self was employed and appeared on the scene to succeed Long, whose service ended April 30, Self, according to his testimony, informed Biscoe that he had taken Long's place on May first and wanted to close up the loan. But according to the testimony of Biscoe, Self informed him that he had succeeded Long, but that Long would remain with the company for a few days to close up certain loans which he had conducted up to that time, one of which was the loan to the appellants.

The burden was with the appellee to prove that Long did not have the authority to bind it by the escrow agreement. Appellee has not discharged that burden. The circumstances on this issue corroborates Biscoe rather than Self. On May first, Self interviewed Biscoe to have him sign the mortgage and notes, and Biscoe told him that he would go to Little Rock on May 3 to see Chamberlin with a view to executing the papers and closing up the loan. Self, instead of meeting him

there on that day, turned over the papers to Long, and Long and other local agents of the appellee appeared on May 3 to conduct the negotiations for the appellee. A clear preponderance of the evidence therefore shows that the appellee had equipped Long with all the indicia of authority necessary to empower him to enter into the escrow contract on behalf of the appellee. The undisputed evidence showed that appellee refused to comply with the terms of this contract, giving as its reason therefor that it had already rendered the service for which it was employed and had earned its commission under the terms of the original contract, which appellants had failed and refused to comply with.

We are convinced that the court erred in sustaining this contention of the appellee. Its decree is therefore reversed, and the cause will be remanded with directions to the trial court to enter a decree dismissing the appellee's complaint for want of equity and granting the prayer of appellants' cross-complaint to cancel and expunge, from the record of mortgages in Lonoke and Prairie counties, the instrument which is the foundation of this action.