HUTSON v. T. M. DOVER MERCANTILE COMPANY.

Opinion delivered April 19, 1926.

1. PAYMENT—ACCEPTANCE OF CHECK.—Where plaintiffs sold cotton to defendant, and accepted checks on a certain bank in payment thereof, and left the purchase money with the bank, relying upon its promise to pay same, and the bank thereafter became insolvent, plaintiffs became creditors of the bank, and could not hold defendant liable.

2. FRAUDS, STATUTE OF—GUARANTY.—An agreement by one to guarantee the debt of another must be in writing signed by the party to be bound.

Appeal from Polk Chancery Court; *C. E. Johnson,* Chancellor; affirmed.

*Lake, Lake & Carlton,* for appellant.

*Norwood & Alley,* for appellee.

Wood, J. Several years ago T. M. Dover was engaged in the mercantile business in the town of Hatfield, Arkansas. After his death his wife and children incorporated the Dover Mercantile Company, in 1917, at Hatfield, with a capital stock of $30,000, each subscribing and taking the amount of stock in the corporation that each was entitled to upon a division of the assets of the estate. The estate was wound up without administration. The Bank of Hatfield was organized at the town of Hatfield in 1910 with a capital stock of $10,000. Prior to, and on September 15, 1921, the Bank of Hatfield was in financial straits. The T. M. Dover Mercantile Company had no interest in the Bank of Hatfield as a corporation except that it was a creditor of the bank, having on deposit on September 15, something like $50,000, and Mark Dover, the manager of the Dover Mercantile Company, had some years before executed a bond in his individual capacity to indemnify depositors in the bank in the sum of $50,000. The State Bank Commissioner, on September 15, 1921, had ordered an assessment of 300 per cent. against the stockholders of the bank, and also a bond for $15,000 was executed, Mark Dover being one of the signers, in order to enable the bank to charge off $36,000 of bad paper and to release the bond that had been executed in the sum of $50,000. The sum of $10,500 was paid in cash, and Mark Dover gave the bank a check for $19,500 against the amount of deposit of the Dover Mercantile Company, which covered the balance of the 300 per cent. assessment. This left $6,000 to be charged off, $5,000 of which sum was taken care of by charging off an apparent surplus in that sum and the remainder was carried on the books of the bank as other assets. To compensate Dover for the amount advanced by him for them to meet the assessment, some of the stockholders transferred their stock and others executed note to a trustee for the amounts assessed against them. These notes later came into the possession of the bank to cover a

deficit of $6,000 which appeared upon the books. After these assessments had been made and thus arranged, the bank was reorganized, and on October 15, 1921, Dover was elected president thereof and continued as president until January 1, 1923. In February, 1922, $40,000 on deposit to the credit of the Dover Mercantile Company in the Bank of Hatfield was transferred from the credit of the Dover Mercantile Company and placed to the credit of what was denominated the "T. M. Dover Surplus Account." On December 14, 1922, as shown by the report of the Assistant Bank Commissioner, the Bank of Hatfield was still in an unsatisfactory financial condition and remained so, and the Bank Commissioner required an additional assessment of 100 per cent. to be levied on the stock, or that an additional bond in the sum of $7,500 be executed, and directed that doubtful assets be disposed of and that an additional 100 per cent. assessment be levied against the stock, or in lieu thereof, a bond in the sum of $7,500 be executed to the Commissioner for the protection of the creditors of the bank. Immediately thereafter Mark Dover and one D. E. Myers executed a bond in the sum of $7,500. In January, 1923, Myers was elected president of the Bank of Hatfield, but, according to one of the witnesses, after Mark Dover went out of office he continued to act as manager—"he was still running things." In February, 1923, Mark Dover borrowed $20,000 from the Merchants' National Bank of Fort Smith, for which he executed the note of the Dover Mercantile Company. He had this amount deposited in the Fort Smith bank to the credit of the Bank of Hatfield. The amount was credited on the books of the Bank of Hatfield to the Dover Mercantile Company's Surplus Account, and, at the instance of Mark Dover, this amount was changed on the books of the Bank of Hatfield from the Dover Mercantile Company's Surplus Account to the Dover Estate Account, in order that no one might draw against the account except Mark Dover himself. On May 16, 1923, the State Bank Commissioner wrote the officers of the Bank of Hatfield, calling their attention to

the fact that the bank was still carrying assets that were worthless, and telling them that it was the purpose of the Bank Commissioner to have the undesirable assets taken out of the bank before the first of January, 1924, and that the officers and directors should work with that in mind. After receipt of this letter, Mark Dover, on June 14, 1923, wrote acknowledging receipt of the above letter of the Bank Commissioner by the Bank of Hatfield, and caused the Bank of Hatfield to remit to the Merchants' National Bank of Fort Smith the sum of $10,000 to be credited on the $20,000 note that Mark Dover had borrowed from the Fort Smith bank. This $10,000 check was drawn in the name of the Dover Mercantile Company, by M. J. Dover, in favor of the Bank of Hatfield. The Bank of Hatfield got credit for the check at Fort Smith and the Dover Mercantile Company got credit for the check on its account with the Bank of Hatfield. This $10,000 in the Bank of Hatfield was part of what Dover had borrowed from the Fort Smith Bank for the benefit of the Bank of Hatfield. Dover himself sent the check instead of the cashier of the Bank of Hatfield, for the reason that the Bank of Fort Smith had Dover's signature.

In the fall of 1923, as soon as the cotton season opened, Mark Dover began buying cotton. He stated to some of the sellers of the cotton that he was paying from a cent to a cent and a half above the market price in order to induce people from whom he bought to patronize the Bank of Hatfield. He paid for the cotton purchased by giving the seller a check in the name of the Dover Mercantile Company, by Mark Dover, on the Bank of Hatfield, or else sent the seller with the weigher's ticket and price of the cotton bought to the bank for settlement. In this manner the balance of over $10,000 to the credit of the Dover Mercantile Company in the Bank of Hatfield was converted into an overdraft for more than $16,000. This was the condition on October 16, 1923, when the bank closed its doors. Instead of honoring the checks drawn by Mark Dover in the name of the Dover Mercantile Company, the cashier and officers of the Bank of Hatfield

induced the sellers of the cotton to leave the amount of their checks or weigher's tickets on deposit in the bank, and, if the farmer insisted upon his money, he was given a cashier's check, the excuse for not paying the money being that the bank had just run out of money, but was expecting more on the evening train. But the money was not forthcoming, and the farmers who sold their cotton to the Dover Mercantile Company were not paid. Such was the procedure of the bank officers and of Mark Dover for the Dover Mercantile Company during the cotton season in 1923 and until the bank closed its doors, the bank at no time paying the money for the cotton which represented an overdraft of some $12,000 which Mark Dover gave for the purchase of cotton to the farmers of the community around Hatfield. After the bank closed its doors the Dover Mercantile Company, through Mark Dover, paid $7,100 to some of the farmers who had sold their cotton to the mercantile company through Mark Dover prior to the closing of the bank, leaving a sum of more than $6,000 unpaid. After the bank closed its doors the Bank Commissioner had a conversation with Mark Dover, in which he asked Dover why he permitted the bank to close and why he withdrew the funds of the Dover Mercantile Company while its president, Myers, was out of town. To this Dover replied that he thought it was time to clean up the bank. Two days before the bank closed its cashier and vice president made an urgent appeal to Mark Dover to give the bank a draft on the Merchants' National Bank of Fort Smith to meet the pressing requirements of the Bank of Hatfield. To this request Mark Dover replied, advising the vice president that, if he had any money in the bank, he had better take it out; that he (Dover) was not going to do anything to relieve the bank's distressed condition. He gave the vice president who was making the request to understand that he was going to let the bank close and reorganize.

On October 16, the day before the bank closed, Dover called the Merchants' National Bank at Fort Smith and had that bank to charge the Bank of Hatfield's account

with $10,000, which $10,000 was carried on the books of
the Bank of Hatfield as a cash reserve, that is, an amount
on deposit with the Merchants' National Bank of Fort
Smith to the credit of the Bank of Hatfield. This act on
the part of Mark Dover left the Bank of Hatfield without
any cash reserve whatever. After the overdraft of the
Dover Mercantile Company's account with the Bank of
Hatfield was created by Mark Dover as above mentioned,
the cashier of the Bank of Hatfield notified Mark Dover
from time to time of such overdrafts, and the only sug-
gestion received from him was a direction to the cashier
to charge the Dover estate with an amount to cover it.
He never offered to give the cashier a check to cover it.
When Mark Dover told the cashier of the Bank of Hat-
field that he had drawn down the credit of the Bank of
Hatfield with the Merchants' National Bank of Fort
Smith, this left the Bank of Hatfield without any cash
reserve, and the cashier closed its doors.

It was shown that the Bank of Hatfield was insolvent
from the time of its reorganization in September, 1921,
until it closed its doors; that Mark Dover knew that fact.
He stated to several people that he knew the bank was
insolvent three months before it closed its doors. On one
occasion, while he was president of the Bank of Hatfield,
he stated to one of its customers, who asked him what he
was doing there, that he was there to get his $25,000. As
early as the spring of 1923 Dover contemplated buying
the mercantile business of one G. G. Goff at Cove for
$25,000. The deal was abandoned when Dover requested
Goff to accept a time deposit for $25,000 on the Bank of
Hatfield, payable in the fall. Goff refused to accept with-
out the indorsement of the Dover Mercantile Company,
which indorsement Mark Dover refused to make.

This action was instituted in the chancery court of
Polk County by the plaintiffs against the State Bank
Commissioner as trustee and the T. M. Dover Mercantile
Company to recover the several amounts claimed by the
plaintiffs, amounting in the aggregate to something more
than $5,000. Plaintiffs alleged that the amounts claimed

by them respectively were evidenced by checks of the Dover Mercantile Company on the Bank of Hatfield, of which Mark Dover was at the time a director and of which he had been president; that Dover at the time of the execution of these checks knew that the account of the Dover Mercantile Company with the Bank of Hatfield was largely overdrawn and that the bank was wholly insolvent.

The plaintiffs alleged, among other things, that Mark Dover conceived a plan of buying cotton of the farmers in the surrounding territory and giving checks or weighers' tickets O. K.'d by him, showing the price to be paid, and sending the holders to the Bank of Hatfield for payment, knowing at the time that the T. M. Dover Mercantile Company had no funds on deposit in the bank with which to pay for said cotton, and that the bank was without the means of paying for same; that thus there would be created an overdraft against the T. M. Dover Mercantile Company in said bank, and in the expectation that said overdraft would be charged on the books of the bank against the account of T. M. Dover estate, and the sellers of the cotton would be substituted as creditors to the bank instead of the T. M. Dover estate. That, pursuant to such plan, Mark Dover advertised extensively in the surrounding territory offering to pay in advance of the market price for cotton, and purchased of each of the plaintiffs cotton in the amount, at the time and for the prices shown on the list attached to the complaint and made an exhibit to the complaint. That, in payment for cotton so purchased, Mark Dover, acting for the T. M. Dover Mercantile Company, gave to the sellers a check on the Bank of Hatfield for the amount of the purchase, or O. K.'d the weighers' tickets, noting the price thereon to be paid for the cotton and sending the seller to the Bank of Hatfield for payment; that he knew at the time of making said purchases that the T. M. Dover Mercantile Company had no funds on deposit in the Bank of Hatfield with which to pay the checks so drawn and the weighers' tickets so given, and that the checks and

weighers' tickets were given with the design and intent of Mark Dover to create an overdraft in the bank against the T. M. Dover Mercantile Company sufficient for and to be used as a charge against the account of the T. M. Dover estate with the bank, and thus substitute the plaintiffs and others who sold him cotton as creditors of the bank instead of the T. M. Dover estate.

It was further alleged that the overdrafts in the Bank of Hatfield against the T. M. Dover Mercantile Company cannot be, either in law or in equity, used as a set-off against what the bank is owing the T. M. Dover estate, or *vice versa,* and that Charles McKee, as Bank Commissioner, will require the T. M. Dover Mercantile Company to pay into the Bank of Hatfield a sum equal to such overdraft, if he has not already done so, and the funds so paid will become a common fund of the bank to be paid and distributed among the ordinary creditors of the bank, whereas such fund, if paid into the bank, should be treated and held as trust fund to the extent of the several claims of the plaintiffs, and that their claims should be ordered paid out of such fund before any part thereof is distributed among the common creditors of the bank. They alleged that, if the amount of the T. M. Dover Mercantile Company's overdraft had not already been paid into the bank, the plaintiffs should be remitted to their rights against the T. M. Dover Mercantile Company to the extent of their respective claims, and the T. M. Dover Mercantile Company should be required to pay to the several plaintiffs the sums respectively due them, and the amounts so paid should be entered as a credit against the overdraft of the T. M. Dover Mercantile Company on the books of the bank. They prayed, among other things, that, if the Dover Mercantile Company had not already paid into the bank funds to cover its overdraft, the court require it to pay into said bank an amount sufficient to cover such overdraft, and that the fund thus created be treated and held as a trust fund for the payment of the claims of plaintiffs, and that Charles McKee, as Bank Commissioner, be required to pay to the plaintiffs

the several amounts. And, in the alternative, that the plaintiffs have judgment for the respective amounts claimed by them against the T. M. Dover Mercantile Company, and that said amounts be credited against the overdraft of the T. M. Dover Mercantile Company with the Bank of Hatfield.

The defendants filed separate answers, in which all the material allegations of the complaints were denied. The T. M. Dover Mercantile Company, after denying all the material allegations of the complaints, also set up that there was a misjoinder of parties in that the right of each plaintiff, if any, was independent and separate of the others, and the facts with reference to each were different. We do not set out the answer of the Bank Commissioner for the reason that the appellants do not contend here that the Bank Commissioner is liable and do not ask for any decree against him.

The above are substantially the issues and facts upon which the trial court entered a decree dismissing the complaints for want of equity, and for costs against the plaintiffs, from which is this appeal.

1. We have set out the testimony upon which the appellants rely to recover decrees against the T. M. Dover Mercantile Company substantially as it is stated by learned counsel for the appellants. It is not sufficient to establish their right to decrees in their favor. The testimony does not prove that Mark Dover told each of the appellants, while he was purchasing their cotton and giving them checks of the Dover Mercantile Company in payment for same, that, if these checks were not paid by the Bank of Hatfield, the Dover Mercantile Company would guarantee their payment. True, Mark Dover stated to one witness for the appellants from whom he purchased cotton that the Dover Mercantile Company was behind the bank, and if the witness would deposit the check with the bank he would not lose a penny. He also told this witness that he would guarantee that the witness got his money. This witness did get his money, and is not one of the plaintiffs in this action. Another wit-

ness for the appellants testified that he was working for
Mark Dover individually and not for the Dover Mercan-
tile Company, and was paid by Mark Dover as an indi-
vidual.   Mark Dover told him, when he talked to witness,
to deposit his money with the Bank of Hatfield—that he
would guarantee it and that the Dover Mercantile Com-
pany would back it up.   When this witness took his cotton
checks to the Bank of Hatfield he went there with the
intention of putting the money on deposit and accept
deposit slips for the money.   He did this on the strength
of what Mark Dover told him.   This witness is one of the
plaintiffs and one of the appellants, and is suing the
Dover Mercantile Company for a balance due him by
the Bank of Hatfield in the sum of $142.70.

Another witness testified that he sold cotton to Mark
Dover in September and October, 1923, in the sum of
$346.81, and took in payment therefor a check of the
Dover Mercantile Company on the Bank of Hatfield. The
witness was not advised of the condition of the Bank of
Hatfield at the time.   Mark Dover had told witness, in
1922, about a year previous to that, when he was working
in the bank, that the Dover Mercantile Company was
behind the bank.   Therefore it will be seen that none of
the above testimony is sufficient to justify the conclusion
that Mark Dover, at the time he purchased the cotton
of the appellants, and as a part of that transaction, rep-
resented to the appellants that the Dover Mercantile
Company would guarantee the payment of the checks by
the Bank of Hatfield and would pay those checks if the
bank failed to pay the same.   The preponderance of the
evidence does not show and does not warrant any find-
ing that Mark Dover, for the Dover Mercantile Company,
guaranteed the appellants, in purchasing their cotton,
that, if the Bank of Hatfield did not pay the checks of the
Dover Mercantile Company, the latter company would
guarantee payment of the same by the Bank of Hatfield.
If the appellants, upon the failure or refusal of the Bank
of Hatfield to pay the checks of the Dover Mercantile
Company when presented, had returned the checks to

the mercantile company and demanded of it payment for their cotton, then unquestionably the mercantile company would be liable. But the undisputed testimony is to the effect that the appellants did not refuse to accept the promise of the Bank of Hatfield to pay these checks, but, on the contrary, left the same with the bank and accepted the promise of the bank to pay the same. Some of the appellants, in lieu of the cash on their checks, left the checks with the bank and accepted cashier's checks instead. This condition obtained without payment on these cashier's checks until the bank closed its doors. The inescapable conclusion therefore is that the appellants accepted the Bank of Hatfield as their debtor and became creditors of the Bank of Hatfield for the amount of the checks given to them by the Dover Mercantile Company in payment for their cotton when they deposited these checks in the Bank of Hatfield, and in lieu of the cash accepted the cashier's checks of the bank. They thus became creditors of the bank, like any other creditors having a general deposit at the time the bank closed its doors. The mercantile company is not liable as a guarantor of debts of the defunct Bank of Hatfield. As we have seen, the testimony does not warrant the conclusion that the Dover Mercantile Company became a guarantor for the debts of the insolvent bank. The remarks made by Dover above were not sufficient to constitute the mercantile company a general guarantor of the debts due the Bank of Hatfield by the appellants at the time it closed its doors; and there is no proof in the record to show that the mercantile company purchased and obtained the cotton from the appellants with the understanding that, if the Bank of Hatfield did not pay the checks of the Dover Mercantile Company, the mercantile company itself would pay these checks.

"A corporation, not expressly authorized to do so, cannot ordinarily contract to become a surety for, or lend its credit to, another person or corporation." *Richardson v. National Bank of Mena,* 96 Ark. 594; *Simmons National Bank v. Dilley Foundry* Co., 95 Ark. 368; *Arkansas*

*Stave Co.* v. *State,* 94 Ark. 27. "It is *ultra vires* of a corporation to enter into contracts of guaranty or suretyship not in furtherance of its business, unless given express authority to do so. The fact that the corporation may reap some indirect benefit from becoming a surety or guarantor for another does not confer upon it implied power to do so. * * * It is not however *ultra vires* for a corporation to enter into contracts of guaranty or suretyship where it does so in the legitimate furtherance of its purposes and business." 7 R. C. L., § 599.

We do not find any testimony in the record to justify us in holding that it was within the scope of the authority of Mark Dover, as manager and president of the Dover Mercantile Company, to guarantee the debts of the Bank of Hatfield. Moreover, even if it had been shown that Mark Dover had authority, as the manager of the Dover Mercantile Company, to guarantee the debts of the Bank of Hatfield, in order to bind the corporation by such guaranty it would have been necessary for him to sign some writing to that effect. Section 4862, C. &. M. Digest. This he did not do. A preponderance of the testimony does not show that there was any collusion between the Dover Mercantile Company and the officers of the Bank of Hatfield to induce the appellants to deposit their checks in the bank for the benefit of the Dover Mercantile Company and not for the benefit of the Bank of Hatfield. It appears that what the officers of the bank said and did in this connection was for the benefit of the bank rather than the Dover Mercantile Company. Therefore it occurs to us that there is an entire failure of proof to show that the Bank of Hatfield and the Dover Mercantile Company were in a collusion to defraud the farmers and did defraud them in the purchase of their cotton by the mercantile company, and the failure of the Bank of Hatfield to pay the checks of the mercantile company. The decree of the trial court was in all things correct, and it is therefore affirmed.