## LONOKE PRODUCTION CREDIT ASSOCIATION *v.* PFEIFER MILLING CO.

CA 79-118                                   595 S.W. 2d 223
Court of Appeals of Arkansas
Opinion delivered February 13, 1980
Petition for Review denied March 10, 1980
Released for publication March 17, 1980

*Wright, Lindsey & Jennings,* for appellant.

*Davidson, Plastiras, Horne, Hollingsworth & Arnold,* by: *Cyril Hollingsworth,* for appellee.

MARIAN F. PENIX, Judge. Pfeifer Milling Co., owned by Louis and Dorothy Pfeifer, began to furnish feed on an open

account to Saline County Pork Producers (SCPP) in December 1975. On March 1, 1976 the balance due Pfeifer was $15,000. On March 12, 1976, the Pfeifers met with John M. Due, a general partner and bookkeeper of SCPP and with Henry Chambers, Vice-president of Lonoke Production Credit Association (PCA). The meeting was held in the PCA office in Lonoke, Arkansas. The Pfeifers were concerned about SCPP's account being approximately $15,000 in arrears, and subsequently stopped delivering loads of feed to SCPP. Mrs. Pfeifer testified as to what transpired:

Q. Now, what did you tell Mr. Chambers, if anything?

A. We discussed the account and that we would not send feed to Saline County unless we were assured of being paid for the feed.

Q. What did he say?

A. He said the account was good and go ahead and send the feed over and they would go ahead and see that we got our money, the PCA.

Q. Did you talk to him about how it would be paid?

A. Yes, we discussed paying it direct, but we had to get a letter of authorization from Mr. Due and Mr. Kane.

Q. Who told you you had to get a letter of authorization before the PCA could pay you direct?

A. Chambers, I suppose.

Q. Did you discuss any terms of payment?

A. Yes, we did, If they would pay on a loan within ten days, we would give them a 2% discount.

Q. Now when . . .

A. And he agreed to that.

Q. Mr. Chambers did?

A. Yes, Sir.

Q. When would that go into effect, did you explain that to Mr. Chambers?

A. Well, the account had built up and when the account became current and they had sent those, you know, within ten days, we would give a discount.

Mrs. Pfeifer further testified that the 2% discount would go into effect once the back due account had been brought current and that such discount had never been done before with that account. Mrs. Pfeifer also testified that she did receive checks directly from the PCA each time a load went to Saline County. Mr. Louis Pfeifer verified Mrs. Pfeifer's testimony and added PCA agreed "That they would pay the account up in full and we would give the Saline County Pork Producers a 2% discount if they paid in ten days."

PCA received the letter of authorization from Mr. Due and Mr. Kane and made payments to Pfeifers between March 13 and July of 1976. On July 22 the balance due was $17,742.63.

Pfeifer sued SCPP, Diversified Financial Services Corporation International, John M. Due, Maurice Hannon, and Realty Consultants, Inc. as general partners of SCPP; David R. Kane, a limited partner and investor in SCPP; and Lonoke PCA, as a guarantor of the account of SCPP. David R. Kane is also President of Diversified Financial Services Corp. International and Realty Consultants, Inc. Before trial Pfeifer released Kane and Realty Consultants, Inc. for $10,-300. Diversified Financial Corp. International, through David R. Kane as president and SCPP through David R. Kane as limited partner, confessed judgment. The remainder of the lawsuit went to trial. The jury returned a defendants' verdict for John Due and for Maurice Hannon and against PCA. PCA appeals.

The parties involved in this lawsuit are intertwined and

somewhat complicated. From 1971 to November 1973 PCA provided 100% financing to defendant John Due's swine operation in Saline County. John Due testified he sold 97 1/2% of his operation to David Kane and Associates with the help of Henry Chambers of PCA, and a limited partnership was formed — SCPP. Due signed notes to defendant PCA in the amount of $300,000. Due agreed to stay on as bookkeeper for the SCPP. Due also testified Kane was general manager and made all the decisions involving funds along with Chambers of PCA. Due testified defendant Hannon was swine manager who made decisions relative to personnel, feed used, sale of swine, etc. Due and Hannon were concerned about paying Pfeifers for the feed and cautioned Louis Pfeifer about selling without positive guarantees from Kane and Chambers. All invoices were sent to PCA for payment direct to Pfeifer.

Appellant PCA moved to dismiss the complaint against it because its only liability, if any, was as a guarantor and that payment or settlement by SCPP as principal, discharged the guarantor (PCA) as a matter of law.

Pfeifer discharged David Kane and Realty Consultants, Inc. The release stated:

> The other individual Defendants who are not released by this Release agreement are as follows:
> Diversified Financial Services Corp. International
> John M. Due
> Maurice Hannon
> Lonoke Production Credit Association

PCA contends the above agreement did not reserve a right of action against SCPP — thereby PCA is discharged. Pfeifers do not allege PCA guaranteed debts or accounts of any defendant other than SCPP. PCA contends Pfeifers' unconditional release of the principal debtor SCPP terminated the guarantor's liability and discharged PCA's obligation on the alleged contract of guaranty.

Appellee Pfeifer contends the question of whether or not there was an agreement between PCA and Pfeifers as an

original undertaking and not merely as a security is an issue of fact for the jury. Pfeifer further contends the nature of this case is one of fact and not one of law as appellant PCA alleges. The jury determined the basis for PCA's agreement with SCPP was more than a guaranty basis and was indeed an original undertaking. Mr. Due testified when he sold his swine operation to persons associated with David R. Kane his indebtedness to PCA was $300,000. He further testified Mr. Chambers, for PCA, negotiated the sale and an additional $250,000 loan from PCA to SCPP. PCA was obviously heavily involved in SCPP. Our Supreme Court has stated the factors to be considered in determining whether an oral promise is original or collateral — the intention of the parties at the time the promise is made, the words of the promise, the situation of the parties, and all the circumstances attending the transaction. *Moraz* v. *Melton,* 167 Ark. 629, 268 S.W. 41 (1925); *Black Bros. Lumber Co.* v. *Varner,* 164 Ark. 104, 261 S.W. 312 (1924); *A.B. Smith Lumber Co.* v. *Portis,* 140 Ark. 356, 215 S.W. 590 (1919); *Leifer Manufacturing Co.* v. *Gross,* 93 Ark. 277, 124 S.W. 1039 (1910).

PCA contends further there is no evidence of sufficient legal consideration for the alleged contract of guaranty. The jury was instructed to consider whether or not there was consideration for the agreement between PCA and Pfeifers. The jury was entitled to consider the 2% promised discount by Pfeifers in connection with the PCA agreement, along with Due's testimony concerning the substantial loans which PCA had at stake, and to consider the benefit to PCA if Pfeifers continued to supply feed to the swine operation. PCA's own witness testified PCA was owed $174,400.61 by SCPP. Pfeifers billed PCA directly. There were no attempts to collect first from SCPP. PCA paid Pfeifers directly. Pfeifers agreed the 2% discount would go into effect once the back due account had been brought current. Pfeifers have completely performed under the agreement. They continued to ship feed to SCPP until SCPP abandoned its operation. Pfeifers' performance under the contract was ended by actions of SCPP and not by Pfeifers' refusal to further perform.

PCA relies on *Crawford* v. *General Contract Corporation,* 174 F. Supp. 283 (WD Ark. 1959) and the language of Judge Miller:

Be that as it may, however, a promise 'to stick by' Crawford falls far short of a promise to finance him for an indefinite time without regard to conditions and circumstances.

The *Crawford* facts are easily distinguishable from the case at hand. There, a man named Bellinger, who was manager of General Contract's Hot Springs office, actively solicited new and used car businesses. Bellinger offered to obtain financing for the car businesses. He represented to plaintiff Crawford that General Contract would stand by them in their financing operations "through thick and thin". Judge Miller held this to be a unilateral contract, a promise in exchange for an act, in which the promisee (plaintiff), had not fully performed (giving all his business to defendants), therefore the contract was unenforceable. We are not dealing with a unilateral agreement in the instant case.

PCA argues Chambers lacked the authority to guarantee the debt of SCPP. There was contradictory evidence as to the scope of Chambers' authority. From the testimony regarding his authority there were sufficient facts to go to the jury. Whether or not the facts demonstrated Chambers had authority to bind PCA was a proper jury question.

From a careful review of all the evidence we find the case was properly submitted to the jury and its verdict should be upheld.

Affirmed.

WRIGHT, C.J., and HAYS, J., dissent.

ERNIE E. WRIGHT, Chief Judge, dissenting. In my view the evidence was not sufficient to make a jury question on the liability of appellant, Lonoke Production Credit Association, for the debt of SCPP to appellee, and the trial court erred in failing to grant appellant's motion for a judgment notwithstanding the verdict.

To sustain the verdict there must be substantial evidence to support each of the following:

(1) That PCA entered into an original promise to pay the debt SCPP incurred with appellee prior to March 12, 1977, the date of the alleged agreement or promise on the part of PCA.

(2) Consideration flowing from SCPP to PCA to support the alleged agreement.

(3) That the alleged promise or agreement on the part of PCA was within the scope of the authority of Henry Chambers, its Vice President.

An examination of the record discloses no substantial evidence to support any of these requirements.

The evidence as to any agreement on the part of PCA with appellee only reflects PCA would pay for future feed deliveries by appellee to SCPP provided SCPP authorized such loan disbursements. I find no evidence that PCA promised or agreed to pay to appellee the account accrued by SCPP prior to March 12, 1977. The strongest evidence relating to such alleged promise was the testimony of Mrs. Pfeifer that Mr. Chambers said, "The account is good and we should go ahead and send the feed." As to the old account, this statement is nothing more than an expression of an opinion and falls short of constituting evidence of a promise or agreement on the part of PCA to pay the old debt of SCPP.

There was no evidence of any consideration other than possible indirect benefits, flowing to PCA to support the alleged promise or agreement to pay the debt of SCPP.

There was no evidence Henry Chambers had authority to obligate PCA to pay the debt of another; on the contrary, the evidence was that there was no such authority. In *Hutson v. T. M. Doves Mercantile Co.,* 170 Ark. 984, 282 S.W. 371 (1926) it was held,

A corporation, not expressly authorized to do so, cannot ordinarily contract to become a surety for, or lend its credit to another person or corporation. — It is *ultra vires* of a corporation to enter into contracts of guaranty or

suretyship not in the furtherance of its business, unless given express authority to do so. The fact that the corporation may reap some indirect benefit from becoming a surety or guarantor for another does not confer upon it implied power to do so.

The case of *National Surety Corp.* v. *Inland Properties,* 286 F. Supp. 173 (E.D. Ark. 1968), affirmed 416 F. 2d 457, is in accord with this rule.

I would reverse.

I am authorized to say Judge Hays joins in this dissent.