H. T. CRAWFORD, individually, H. T. Crawford, d/b/a Crawford Motor Company; H. T. Crawford and W. I. Meeks, a partnership, formerly doing business under the partnership firm name of Crawford Chevrolet Company, H. T. Crawford, Wayne Caldwell and Dwain Crawford, a partnership doing business under the partnership firm name of Dwain Crawford Buick Company, and H. T. Crawford, Waldo Pool, Joe Shirley, and Milton Crawford, a partnership, formerly doing business under the firm name of Crawford Auto Sales, Plaintiffs,

v.

GENERAL CONTRACT CORPORATION and Securities Investment Company of St. Louis, Defendants.

Civ. A. No. 762.

United States District Court
W. D. Arkansas,
Hot Springs Division.
June 2, 1959.

Shaver, Tackett & Jones, Texarkana, Ark., Lookadoo, Gooch & Lookadoo, Arkadelphia, Ark., Van Johnson, Texarkana, Ark., for plaintiffs.

Cockrill, Laser & McGehee, Little Rock, Ark., for respondents.

JOHN E. MILLER, Chief Judge.

### Statement

On July 11, 1957, the plaintiffs herein filed their complaint in the Texarkana Division against the defendants, General Contract Corporation and Securities Investment Company of St. Louis, hereinafter referred to collectively as General. The complaint is extremely prolix but in essence it alleged that the plaintiffs, who will be identified more particularly in the findings of fact, were engaged in four business operations in various parts of Arkansas and using various forms of business enterprise, all of which businesses were engaged in the sale of automobiles at retail. After setting forth the jurisdictional facts, the complaint alleged that for over two years prior to January 7, 1956, Glenn Bellinger, manager of the defendants in Hot Springs, Arkansas, actively solicited the businesses to finance their new and used cars through an arrangement with the defendants, and in the course of such solicitation represented to the plaintiffs that General would stand by them in their financing operations "through thick and thin." The complaint alleged that relying upon such representations and assurances, the plaintiffs curtailed their financing operations with other companies and gave their financing business to General until the 7th day of January 1956, when General refused to accept any further financing. The complaint also alleged with particularity representations by Bellinger as defendants' manager that the defendants would finance up to $80,000 on a new business to be opened by three of the plaintiffs in the City of Hot Springs, Arkansas; that a contract was thereafter signed on January 6, 1956, with General, but that on January 7, as set out above, defendants refused to deal further with the plaintiffs.

In various particulars the plaintiffs then alleged that the sudden termination of credit and financing caused rumors among financial institutions, which resulted in the plaintiffs' inability to obtain adequate financing elsewhere; that by reason of the loss of their commercial credit some of the plaintiffs were obliged to and did sell at a loss various properties in an attempt to finance their own automobiles, and that each of the plaintiffs was damaged in specified sums as a result thereof.

The plaintiffs also alleged an agreement between the plaintiffs and General to the effect that when a purchaser of an automobile from one of the plaintiffs became delinquent on his note (which was guaranteed by the plaintiffs), the defendants would promptly notify the particular plaintiff involved and that upon receipt of such notice, the plaintiff would contact the delinquent purchaser and usually succeed in an arrangement for payment which would avoid costly repossessions. The plaintiffs alleged that following the termination of their financing

with General, that General would consistently delay in repossessing automobiles so that when repossessed such automobiles were damaged and of little value; that the plaintiffs having obliged themselves to purchase such repossessions from General for the amount due thereon, thereby were forced to take automobiles of comparatively little value.

The plaintiffs attached a copy of two agreements signed by the plaintiffs and defendants, which on their face constituted the full contracts between the parties, but the plaintiffs alleged that such contracts are a ruse to avoid the laws of the State of Arkansas governing usury, and that they are illegal and void on that ground. Following this allegation the plaintiffs pray that all of their contracts executed by the plaintiffs' customers and upon which the plaintiffs are guarantors by reason of separate contracts be declared illegal and void. The plaintiffs also alleged that as an additional scheme to avoid the usury laws, the defendants established a dealer's reserve and a dealer's special reserve in favor of the various plaintiffs, which reserves were credited from payments made by the purchasers of automobiles and which when considered as a part of the payment rendered the notes usurious.

Finally, the plaintiffs alleged that the action of General in abruptly cutting off credit and in uttering and publishing degrading words with respect to the credit and business standards of the plaintiff H. T. Crawford was willful, wanton, and malicious conduct, which damaged the plaintiff H. T. Crawford, and injured his credit and business standing, for which he prays damages in the sum of $50,000 and punitive damages in the sum of $50,-000.. Each of the plaintiffs prayed damages for the damage to his business, for punitive damages, and certain plaintiffs also prayed damages for losses incurred in an attempt to finance their own businesses and for the amounts paid to the defendants as guarantors under their written contract for the usurious paper.

Prior to the filing of answers by the defendants, the cause was transferred by Honorable Harry J. Lemley to the Western Division of the Eastern District of Arkansas, and subsequently by the Honorable Axel J. Beck to the Hot Springs Division of the Western District of Arkansas.

Various interlocutory matters which are not relevant here came before the court, and on December 23, 1958, the defendants filed their separate answers to the complaint, and at the same time filed a joint motion to dismiss the allegations of the complaint relating to the claim of usury on the ground that the plaintiffs, being a party to the allegedly usurious contracts, could not take advantage of any claim of usury. On January 9, 1959, the court advised the parties that a ruling on this motion to dismiss would be reserved until the case had been fully developed at trial.

On April 1, 1959, a pretrial conference was held at which all of the parties were represented, and the court at that time advised the parties that in the interest of economy of time and money, the case should be tried upon all the issues of the complaint except those relating to the allegations of usury, and that if upon consideration of the defendants' motion to dismiss those allegations, the motion were denied, a second hearing could be held to determine whether the contracts were usurious and the amount of damages to which the plaintiffs would be entitled thereunder.

Accordingly, the case proceeded to trial to the court without a jury on April 29 and 30, 1959, and was tried upon all issues except those raised by the plaintiffs' allegations of usury. By agreement of the parties leave was given to submit in written form by stipulation the testimony of Olin Hendrix and A. C. Stone, which testimony has been received in the form of affidavits, together with the stipulation of the defendants for the admissibility of such testimony subject to objections of relevancy and materiality.

Immediately prior to the beginning of the trial, the plaintiff Crawford Chevrolet Company was given leave to file an amendment to the complaint, in which it

was alleged that this plaintiff prior to December 9, 1955, had been as originally alleged a partnership, but that on that date and thereafter the partnership was terminated in favor of the Crawford Chevrolet Company, Inc., an Arkansas corporation, which acquired the assets of the original partnership. Leave was also given to the defendants to file an answer to said amendment, which answer was duly filed, admitting the facts set forth in the amendment and pleading the statute of limitations as a bar to any action by the corporation.

Following the trial, the case was submitted subject to the receipt of the written testimony of Olin Hendrix and A. C. Stone. That testimony has now been received and considered along with all of the ore tenus testimony in the case, the exhibits, and the pleadings and briefs of the parties, and the court now makes and files its formal Findings of Fact and Conclusions of Law.

### Findings of Fact

#### 1.

The plaintiffs, H. T. Crawford, W. I. Meeks, Wayne Caldwell, Dwain Crawford, Waldo Pool, Joe Shirley, and Milton Crawford, are citizens of the State of Arkansas, and in various combinations more fully set forth below were partners doing business under the names Crawford Chevrolet Company at Glenwood, Arkansas; Crawford Motor Company at Benton, Arkansas; Dwain Crawford Buick Company at Magnolia, Arkansas; and Crawford Auto Sales at Hot Springs, Arkansas. The plaintiff Crawford Chevrolet Company, Inc., is an Arkansas corporation and was doing business in the town of Glenwood, Arkansas, as successor to the Crawford Chevrolet Company. The defendant General Contract Corporation is a Missouri corporation authorized to do business within the State of Arkansas, and the defendant Securities Investment Company, is a corporation organized under the laws of Delaware and authorized to do business in the State of Arkansas.

The amount in controversy exceeds the sum of $3,000, exclusive of interest and costs.

#### 2.

The central figure in the development of the business enterprises of the plaintiffs and in this litigation is the plaintiff Mr. H. T. Crawford. Sometime in the 1930's, H. T. Crawford entered business at Glenwood, Arkansas, as an automobile dealer, which business he pursued for some time under the name of Crawford Chevrolet Company. For convenience this dealership will be referred to as the Glenwood business. This business was a prosperous one, and in 1947 Crawford invested $108,000 in a new building for the Glenwood business.

In 1952 Mr. W. I. Meeks, a former employee, became a partner upon the investment of $4,500, and continued his partnership with Crawford in the Glenwood business thereafter until that business was incorporated on December 9, 1955, at which time he became a small shareholder. Although he owned only a small percent of the stock in the corporation, he was listed as holding one-third of the shares for purposes of dealing with automobile manufacturers.

As Crawford's business in Glenwood prospered, he decided to extend his operations, and in 1953 he built a plant and opened a business at Benton, Arkansas, as an individual proprietorship, known as the Crawford Motor Company, which for convenience will be referred to hereafter as the Benton business.

Thereafter he "staked" his son, Dwain Crawford, in the opening of an automobile dealership in Magnolia, Arkansas, known as the Dwain Crawford Buick Company, and operated as a partnership between Dwain Crawford and Wayne Caldwell. This partnership for convenience will be referred to hereafter as the Magnolia business.

In the latter part of 1955, H. T. Crawford considered opening a "supermarket" automobile business in Hot Springs, Arkansas, for the purpose of selling new and used cars but without a

franchise from an automobile manufacturer. He intended to purchase the new cars cheaper than they could be bought by franchised dealers. In this enterprise he accepted as partners the plaintiffs Mr. Joe Shirley and Mr. Waldo Pool, both of Hot Springs, Arkansas. At this time the defendant General was financing a large portion of the cars sold from the businesses at Glenwood, Benton, and Magnolia. Mr. Glenn Bellinger, the defendants' manager at Hot Springs, Arkansas, actively solicited the business for the Hot Springs auto sales and encouraged Crawford to proceed with that business.

At that time Crawford was concerned because, as he expressed it, he had all of his financial eggs in one basket. He originally intended to do his financing in the Hot Springs business with another finance company, but Bellinger was successful in persuading him and his partners from this move, and on January 6, 1956, a standard form agreement, known somewhat inaptly as the "Dealer Protection Agreement," was signed on behalf of the Hot Springs business.

The following afternoon Mr. Bellinger hastily arranged a conference with H. T. Crawford and W. I. Meeks, which took place in Hot Springs late in the afternoon. At that time he advised Crawford and Meeks that General would finance no further automobiles for the Hot Springs, Benton or Glenwood businesses. Within a few days the defendants' manager at Texarkana, Arkansas, whose district covered the Magnolia business, advised Caldwell and Dwain Crawford that the defendant would cease floor-planning automobiles for the operation at Magnolia. This is the action out of which this suit grows.

### 3.

Prior to 1954 the plaintiff H. T. Crawford and the other plaintiffs had been financed in their various dealerships through several different finance companies and largely through General Motors Acceptance Corporation. Financing for a dealer in new and/or used automobiles is essential to the operation of the business. Except for the proposed business at Hot Springs, all of the dealerships involved here were either franchised dealers for Buick or Chevrolet cars, or were purchasing them directly from the factory. In addition, at least at Hot Springs, other cars, both new and used, were purchased from other dealers or accepted on trade-ins. The purchase of cars for resale, that is, wholesale purchases, were "floor-planned" largely by General Motors Acceptance Corporation, hereafter referred to as GMAC. This type of wholesale financing contemplated that the dealer would be furnished the purchase price of the automobiles bought by him for resale and would immediately repay the same upon their sale at retail. In addition to this type of financing, it is necessary for dealers in automobiles to have available financing arrangements for purchasers of their cars at retail. This was the financing aspect in which the defendant General was primarily interested, although it also did wholesale financing or floor-planning.

In 1954 GMAC terminated its financing arrangements with Crawford at the Glenwood business. GMAC had been, up until that time, one of the principal finance companies through which the Glenwood business operated. Mr. Glenn Bellinger, the defendant's manager in Hot Springs, took that opportunity to gain more financing business for his company with the plaintiff H. T. Crawford. He advised Crawford that his company could furnish personal supervision and advice and that he would have good men collecting the accounts. Crawford had previously given some of his business to General, and these representations convinced him that at least under the circumstances as they existed at that time, he should work with General. Bellinger desired to obtain as much business from Crawford through his various dealerships as possible, and actively solicited Crawford to give General all of the financing business at the various dealerships. He advised Crawford in substance that if Crawford would give General all of his business and would stay

with General, then General would always "stay" with Crawford as long as Crawford stayed with General. Accordingly, a "Dealer Protection Agreement" was subsequently executed on behalf of the Glenwood business and the Benton business on or about February 16, 1954, which agreement in its entirety is as follows:

"Dealer Protection Agreement

"To General Contract
 Corporation February 18, 1954
 "614 Ouachita Avenue,
 Hot Springs, Ark.

"1. We plan to offer for sale to you from time to time notes, contracts, chattel mortgages (hereinafter called "notes") as may be acceptable to you, arising out of the sale at retail of new or used motor vehicles (hereinafter called "cars"), the purchase price of such notes to be agreed upon at the time of such purchase, and this agreement shall apply to all notes (Whether endorsed with or without recourse except that the obligations assumed by you in Section 3 hereof shall not apply to notes endorsed with recourse) purchased by you during the continuance hereof, and to all cars covered thereby. 'Repossessed cars' shall mean cars, the actual possession of which you regain after default in the notes covering the same, by virtue of the powers contained in, or by foreclosure of, any conditional sales contract or chattel mortgage or otherwise.

"2. In addition to any obligation we may have with respect to any note or car as evidenced by our endorsement of such note or otherwise, you shall have the option (which you shall not be obligated to exercise) at any time after repossession of any car to require us to repurchase said car by tendering the same at our place of business, or if we are out of business or in default in any obligation to you by tendering the same by letter mailed to our last known business address. The purchase price shall be:

"The balance owing on the note covering such car at the time of repossession (a) if tendered within ninety (90) days after the original or any extended maturity of the earliest installment unpaid at the time of such tender, or (b) if tender is delayed by litigation or the existence of a redemption period either before or after repossession, or by your inability after repossession without your fault to obtain the legal right to sell such car. We agree to store every such car for you at our expense until paid for and to deliver the same to you at any time on demand, the sale of such car being a cash sale and the car remaining your property until paid for, with no authority in us to sell or dispose of the same.

"3. You are to assume the risks of a loss by reason of collision, conversion and confiscation, as defined below (except that you shall not assume such risks in the case of notes endorsed with recourse):

"(a) Collision: Single interest collision, meaning the accidental collision of a car with another object or accidental upset of a car. The risk of a collision with respect to any car is assumed by you when the repossession is the result of one such collision only. The risk of any collision damaging fenders, radiators, grillwork or other material protecting radiators, lights, hub-caps, tires, windshields, windows, or any of them, unaccompanied by damage to parts of the car other than one or more of those parts mentioned, is not assumed by you, it being conclusively presumed in each case that any default did not result from such collision, and the risk of any other collision not resulting in default is likewise not assumed by you.

"(b) Conversion: The fraudulent concealment or fraudulent disposal of a car by the purchaser of the

same executing as maker the note covering such car.

"(c) Confiscation: Confiscation of a car by duly authorized governmental authorities.

"4. We hereby warrant with respect to each and all notes to which this agreement is or shall be applicable, and all cars covered thereby: (a) that we have not made and will not make known to the purchaser of any car directly or indirectly the fact that you have assumed the risks above mentioned or any of them; (b) that the purchaser has made an actual down payment in cash not advanced by us or trade-in allowance; (c) that unless expressly otherwise provided in the note or lien instrument covering the same, no car is or will be used for taxi, jitney or 'Drive Yourself' service; (d) that all persons signing notes have legal capacity to do so; that all notes (including all chattel mortgages, conditional sales contracts and other lien instruments) are genuine, valid and in all respects what they purport to be; that all descriptions therein contained are correct; (e) that no settlement will be made by us with the maker of any note except as we may be specifically authorized by you.

"5. In case of any breach of any warranty herein contained with respect to any note purchased during the continuance hereof or any car covered thereby, we will on demand at any time pay you the total unpaid balance owing on such note.

"6. Upon the purchase of any note with or without recourse, you may withhold out of such purchase price an amount to be held with other amounts similarly withheld as a reserve. The method of computing the amount to be withheld in said reserve may be varied from time to time or changed by mutual agreement without in any way affecting this agreement. The amount of any reserve now held by you for us shall also be a part of said reserve. Said reserve shall be held as security for the performance of all obligations of us to you now existing or held by you, or which may come into existence, or be held by you at any time during the continuance of this agreement. If any obligation secured by said reserve shall not be paid when due, you may apply all or any part of said reserve to such obligation. Periodically we shall be entitled to withdraw a portion of the reserve withheld, provided that such withdrawal will not reduce said reserve below $1000.00 or 5% of the total unpaid balance of all notes, whichever is the larger. Said reserve is specifically understood to be the withheld portion of the purchase price of notes and not a deposit, and said reserve shall, therefore, earn no interest nor be subject to withdrawal by us except as herein provided.

"7. Presentment for payment, demand, protest and notice of dishonor are waived with respect to all notes, and it is agreed that you may renew or extend any note, in whole or in part, once or more often, with or without notice to us, without affecting our liability with respect to such note hereunder. If, with or without notice to us, you settle with the maker of any note or repossess or accept the surrender of any car in such manner as to extinguish the maker's obligation to pay such note, and if the note is one which we are or shall be obligated to pay to you, either under the terms hereof or by virtue of any endorsement of said note or guaranty or other obligation, then we shall be and remain liable for the deficiency remaining after applying to the balance unpaid on such note at the time of such settlement, repossession or surrender, the cash realized (by resale of the car by you after repossession, or otherwise) as a result of such settlement, repossession, or surrender.

"This agreement shall continue in force until notice of termination given to you by us by registered mail at 614 Ouachita Avenue, City of Hot Springs, State of Arkansas, but such termination shall have no effect except as to notes purchased after the receipt of such notice. This agreement shall apply to, inure to the benefit of and bind the executors, administrators, successors and assigns of both you and us and any company affiliated with you which may acquire any note to which this agreement is applicable.

"Crawford Motor Company
"By /s/ H. T. Crawford

"Accepted at Hot Springs, Arkansas, this 16th day of February, 1954.

"General Contract Corporation
"By /s/ Wm. A. Swink"

Subsequent, apparently, to similar inducements, an identical agreement was executed on behalf of the Magnolia business and accepted September 19, 1955, by the defendant.

Crawford never at any time gave all of his financing business to the defendant, but he did give a large part of the retail financing to General. The wholesale financing at the Benton business, which was a Buick agency, was continued through GMAC until terminated by that company, as hereafter set forth. Crawford understood the oral statements by Bellinger prior to the execution of the Dealer Protection Agreement as leaving him an option to place his financing business with any company, but testified that he regarded General as obligated to continue to finance him indefinitely so long as he desired such financing, notwithstanding the termination provision in the Dealer Protection Agreement.

4.

The parties operated under the provisions of the Dealer Protection Agreement for some time. On all retail financing the conditional sales contract, which the purchaser of an automobile from one of the Crawford agencies was required to sign, was furnished by the defendant General. The conditional sales contract was required to be made out in accordance with instructions from General and various schedules and tables furnished by it. Any contract not so filled out was not acceptable to General, and it would not be purchased by that company. Each conditional sales contract was accompanied by a note signed by the purchaser and payable to the dealer selling the automobile. Each such note was endorsed "Without Recourse" by the dealer and offered to General which would customarily purchase the same, subject to the contractual provisions of the Dealer Protection Agreement, which provided that the dealer would repurchase any car upon which default had been made.

When payments by a purchaser would become delinquent, General would attempt to bring the account up to date, and if unsuccessful, would repossess the automobile, and ordinarily exercise the option provided in the Dealer Protection Agreement to require a repurchase by the dealer for the balance of the purchase price due on the automobile. Upon the exercise of this option, the dealer was allowed either to pay the balance due by check or to authorize the defendants to debit his reserve account provided for in paragraph 6 of the Dealer Protection Agreement.

As heretofore stated, the plaintiff H. T. Crawford determined to open a business in Hot Springs to be conducted as an "automobile super-market" in which he would sell both new and used cars. It was his belief that he could purchase new automobiles of various makes from dealers in other parts of the country and sell them cheaper than a franchised dealer could sell the same make of automobiles at Hot Springs. Pursuant to this plan he made arrangements for a partnership with the plaintiffs Waldo Pool and Joe Shirley. Bellinger actively solicited these three men in an effort to obtain the financing business from the Hot Springs operation. Crawford was reluctant to "put all of his financial eggs in one basket." However, Bellinger re-

newed his persuasiveness, emphasizing the service which he could give, the personal attention and advice, and reiterated his representation that General could be relied upon to "stick" with Crawford if Crawford would "stick" with General. Following the familiar practices of salesmanship, he assisted Crawford and his partners in cleaning the lot upon which they were to do business in Hot Springs and took them to dinner. He advised Crawford that he had talked to General's office in St. Louis and could obtain a line of credit for the Hot Springs business of $80,000. Crawford was not interested in that much credit and advised him that $50,000 would be adequate. In any event, thereafter on January 6, 1956, Crawford and his partners were induced to sign a Dealer Protection Agreement with General, which is identical to the one already reproduced. That agreement was never accepted by General.

On the same day, unknown to Bellinger, the defendant General was engaged in cross-checking motor numbers on vehicles which it was financing with motor numbers on vehicles financed by GMAC. This cross-check developed that the records of each company indicated duplication of financing. In other words, the records furnished by GMAC to the defendant General indicated that it was financing for Crawford some of the same vehicles financed for Crawford by General. The plaintiff objected to all the testimony relating to duplication of motor numbers. The objection was sustained insofar as the testimony was offered to show the truth of such duplication, but is admitted and considered by the court insofar as it shows the business records of General and its reason for curtailing the plaintiffs' financing. Accordingly the court makes no finding as to whether or not such duplication actually existed, but limits its finding to a determination that the records of General so indicated, and that this was one of General's reasons for termination.

On the same day, January 6, 1956, GMAC terminated its wholesale financing with the plaintiff Crawford at the Benton business. Immediately following the cross-check of motor numbers, the defendants' vice president, Mr. Walter Shuberg, advised Bellinger to make a wholesale check on these and other contracts which General held. Bellinger made such a check on Saturday morning, January 7, and after so doing and reviewing Crawford's cash position, communicated with Shuberg, and it was decided to discontinue financing the Crawford businesses at Glenwood and Benton and not to accept the Dealer Protection Agreement previously offered by Crawford for the Hot Springs business.

There was testimony by several witnesses as to declarations made by Bellinger that financing for Crawford's business was terminated due to pressure from competing car dealers in Hot Springs, but in view of the court's conclusions as set out in the discussion which follows the Findings of Fact it is unnecessary to determine this issue.

The Magnolia business owned by the plaintiffs, Dwain Crawford and Wayne Caldwell, was also financed by General, but was not located in Bellinger's district. The Magnolia business was dealt with on behalf of the defendants by Fred Moffitt at Texarkana, Arkansas, who independently recommended discontinuing floor planning at the Magnolia business at about the same time because he was dissatisfied with the financial information being furnished to him by the Magnolia dealership, and also because he had discovered the sale of an automobile from that dealership to a person shown on the contract to be one Homer Harrison, but actually not purchased by that person. On the afternoon of Saturday, January 7, 1956, Bellinger arranged a meeting with Crawford and advised him of the defendants' determination to terminate the financing arrangements.

5.

Following the termination of this line of credit with the defendants on January 7, 1956, the plaintiffs were left without complete and regular financing. Accordingly they attempted to finance their

businesses in various other ways. Mr. H. T. Crawford attempted to secure financing with Universal C. I. T. in Hot Springs, but was advised that no financing could be furnished. There is a dispute between the parties as to whether this financing was refused because of suspicion aroused by General's termination or because of "pressure" exerted upon C. I. T. by other automobile dealers in Hot Springs. The court does not find a resolution of this dispute material.

Crawford was able to borrow substantial sums from several different banks in several areas, including the bank at Glenwood, the Bank of Prescott, and the Elk Horn Bank and Trust Company of Arkadelphia, Arkansas. When the various banks became aware of the termination of financing with General, they insisted upon substantial security for their loans, although before that time all had made substantial loans with little or no security. The termination of financing by General made the banks fearful that there were undisclosed aspects to Crawford's financial situation, and they accordingly required good security before substantial loans were made.

The Elk Horn Bank and Trust Company at Arkadelphia was particularly concerned because in the latter half of January, shortly after it began doing business with Crawford (using warehouse receipts as security), Glenn Bellinger called that bank seeking to check motor numbers on the warehouse receipts. The bank had been reluctant to give this information, and Bellinger advised that he only wanted to check to determine whether the bank held receipts on the same vehicles covered by General's financing. This conversation led the Elk Horn Bank to believe that Crawford "was either dis-honest [sic] or was having serious financial difficulties." The bank was not in the trade area of the Crawford businesses, and for that reason also the bank was unwilling to accept a bare financial statement as a basis for a further line of credit, but it did make one further loan to Crawford after the conversation with Bellinger above referred to.

The loans which Crawford obtained, although substantial, were apparently inadequate for the operation of all his businesses, and on March 1, 1956, he sold the business at Glenwood for a total of $103,-000, a substantial loss on his original investment.

Crawford testified, and the court finds that within 90 days after the termination of credit with the defendant, all other finance companies operating in the area made their credit available to plaintiffs. This, however, was insufficient or too late, according to Crawford, and he proceeded to liquidate many other assets in an effort to keep his business at Benton in successful operation. He sold his home, then at Benton, for $25,000, a loss on the purchase price of $12,000. However, this sale did not occur until sometime in 1957 and in the same year or in 1958 he also sold a farm for $42,000, a loss on his investment therein of $10,500. He also sold certain apartment houses in Glenwood, Arkansas, valued at $12,000 and disposed of for $7,500.

In the latter part of 1956 the plaintiff Joe Shirley had terminated his partnership in the Hot Springs business and later Crawford made arrangements with Waldo Pool to terminate his (Crawford's) participation in that business. Pool continued to operate the Hot Springs business for approximately two more years until the latter part of 1958 at a loss of $20,500.

The termination of credit with the defendants occurred on Saturday, January 7, 1956. Mr. H. T. Crawford apparently thereafter devoted a substantial part of his efforts in an attempt to maintain and operate the Benton business which was a sole proprietorship. While it was 90 days before financing was resumed at the other operations, Crawford did obtain substantial financing from Murdock Acceptance Corporation as to the Benton business, although that company's operations did not extend to areas of the state covered by the plaintiffs' other business-

es. Prior to the termination of financing with the defendants, the Crawford business at Benton had been a substantially profitable operation during most years, and had been selling as many as 80 or 90 cars a month. In 1954 the operation at Benton showed a net profit of approximately $6,200, and in 1955 approximately $41,000. During those periods, as stated, a substantial number of cars was being sold each month from the Benton business. In 1956, following the termination of financing, Crawford was able immediately to secure financing from the Murdock Acceptance Corporation and started financing with that company beginning in January. Notwithstanding that he had been moving 80 to 90 cars per month in the Benton business, his offerings to Murdock for financing in January 1956 consisted of notes on 7 cars, 6 of which were accepted by Murdock. The following month, Crawford submitted 10 offerings to Murdock, 5 of which were accepted. Thereafter his offerings increased until May 1956, when some 44 offerings were made to Murdock, 36 of which were accepted and financed by that company. However, beginning in June 1956 the number of offerings for financing decreased at an uneven rate throughout the year. In November of 1956 only 11 notes were offered to Murdock, all of which were accepted.

In the year 1956 the Benton business took a net operating loss of approximately $74,000. The consolidated net loss for 1956, including the businesses at Hot Springs, Glenwood and Benton, was approximately $72,000. In 1957 only the business at Benton was being operated by H. T. Crawford, and in that year he showed a loss of approximately $29,000. Thereafter in May of 1958 Crawford sold the business at Benton.

Mr. H. T. Crawford's consolidated net worth based upon cost less depreciation (not market value) as of December 31, 1955, was $374,312.88. As of December 31, 1956, his consolidated net worth was approximately $267,000.

Although Mr. Crawford's accountant testified that the profit in 1955 from the Benton business alone was in excess of $41,000 and the profit from the Glenwood business was in excess of $10,000, the accountant admitted on cross-examination that the income tax reported for the same year was only approximately $13,000.

The audit reports introduced in evidence indicate that during the calendar year 1956 the Benton business sold approximately $375,000 less new cars and trucks than in the preceding year. There was also a substantial drop in the dollar volume on the sales of used cars and trucks. However, the audits also indicate that in addition to the loss of dollar volume, there was an increase in most costs. In 1955 the dollar volume in new cars and trucks was shown to be approximately $836,000, and the cost of the same items was $721,000. In 1956, while the dollar volume on the sales of new cars and trucks had dropped to approximately $461,000, the cost of the same items was approximately $408,000. Thus, in 1956 the cost of new cars sold was approximately a full percentage point higher than it was in 1955. During 1955 salaries for car salesmen amounted to slightly better than $15,000, but in 1956 salaries for car salesmen amounted to almost $18,000.

In various other ways the significance of the plaintiffs' testimony relating to their loss of profits after January 7, 1956, has been put in issue, but the figures outlined above are sufficient to make the contentions of the parties understandable, and the court does not find it necessary to detail the accounting further.

6.

Following the termination of credit, Crawford also had difficulties in an increasing number of repossessed automobiles which he contends is a result of the defendants' failure to collect accounts adequately. The only testimony offered to support this contention was that on one or possibly several occasions a person hired by Crawford to make collections was more successful than the defendants' collector. The court finds that the defendants were not derelict in collecting the accounts due.

The defendants, following the termination of the credit, on many occasions neglected to repossess automobiles upon which payments were not current until almost 90 days after the payments became delinquent. However, the court finds that there was no contract, agreement or promise under which the defendants undertook to pursue any other procedure or to notify the plaintiffs or any of them when an account became delinquent.

## Discussion

The parties by their pleadings and briefs have raised five central issues which should be considered and resolved in the determination of this action:

1. Was there a valid and enforceable contract between the parties under which the defendants were obligated to furnish credit or financing to the plaintiffs indefinitely;

2. Was there a valid and enforceable contract between the parties whereby the defendants became obligated to notify the plaintiffs of delinquent accounts and to repossess automobiles upon which payments had become delinquent immediately thereafter;

3. Was the guarantee by plaintiffs to repurchase cars upon which payments had become delinquent an invalid obligation;

4. If the conditional sales contracts and accompanying notes were usurious, may the plaintiffs take advantage of such alleged usury in this suit;

5. Did the defendants commit actionable slander against the plaintiffs or any of them?

It is the plaintiffs' contention that the defendants' manager at Hot Springs made an oral contract with the plaintiffs under which General became obligated to furnish credit or financing to the plaintiffs so long as they desired, and that in refusing to finance plaintiffs they breached this alleged oral contract. At the outset the defendants raise the issue whether under the admitted language used by Bellinger a valid and enforceable oral contract ever existed. They first argue that there was no mutuality of contract because the plaintiffs were free to take their financing business elsewhere at any time, while the defendants allegedly were obligated to continue financing indefinitely at the option of the plaintiffs.

There is a certain amount of confusion about the doctrine of "mutuality." This has been summarized in 12 Am.Jur., Contracts, Sec. 13:

"In many judicial decisions there may be found language to the effect that in order that a contract may be enforceable there must be mutuality. It has even been said that a contract implies mutual obligations. If by mutuality is meant, as some courts have suggested, that there must be an undertaking on one side and a consideration on the other, the necessity for its existence cannot be questioned. But if, as other courts have said, mutuality of obligation means that a contract must be binding on both parties, so that an action may be maintained by each against the other, the statement that mutuality of obligation is essential to every contract is too broad. * * * Inasmuch as a promise by one person is merely one of the kinds of consideration that will support a promise by another, mutuality of obligation is not an essential element in every contract. Therefore, to say the least, language which is susceptible of the interpretation that consideration and mutuality of obligation are two distinct elements lacks precision. Consideration is essential; mutuality of obligation is not unless the want of mutuality would leave one party without a valid or available consideration for his promise."

The alleged oral contract was made, if at all, in Arkansas and was to be performed in this State. The law of Arkansas therefore governs. The Supreme Court of Arkansas appears to have followed both approaches to the doctrine of mutuality. In two cases it has held that an employee whose contract

provided that he could not be discharged without a hearing and a showing of good cause had no cause of action when he was discharged without regard to those provisions, on the ground that the employer had no like right to retain the employee's services indefinitely. Petty v. Missouri & Arkansas Ry. Co., 1943, 205 Ark. 990, 167 S.W.2d 895; St. Louis, I. M. & S. R. Co. v. Matthews, 1897, 64 Ark. 398, 42 S.W. 902, 39 L.R.A. 467.

On the other hand, the Court has expressly held that want of mutuality is not a defense to an otherwise valid contract which is supported by consideration. In Johnson v. Johnson, 1934, 188 Ark. 992, at page 994, 68 S.W.2d 465, at page 466, after reviewing earlier decisions, the Court said:

"An examination of those cases discloses that the doctrine stated was applied because the want of mutuality would leave one party without a valid or available consideration for his promise. Such is not the case in the contract before us. The consideration for appellant's promise to pay was his purchase of the stock with whatever advantage which might result to him thereby, whether great or small, and is sufficient to support the obligation on his part to resell to his vendor upon the happening of the contingency named in the contract * * *."

The Court has recently reaffirmed this position. In Lindner v. Mid-Continent Petroleum Corp., 1952, 221 Ark. 241, at page 243, 252 S.W.2d 631, at page 632, the Court said:

"It is argued by the appellants that the lease from Mrs. Lindner to Mid-Continent is lacking in mutuality in that the lessee can terminate the contract upon ten days' notice, while no similar privilege is granted to the lessor. This contention is without merit. Williston has pointed out that the use of the term 'mutuality' in this connection 'is likely to cause confusion and however limited is at best an unnecessary way of stating that there must be a valid consideration.' Williston on Contracts, § 141. As we held in Johnson v. Johnson, 188 Ark. 992, 68 S.W.2d 465, the requirement of mutuality does not mean that the promisor's obligation must be exactly coextensive with that of the promisee. It is enough that the duty unconditionally undertaken by each party be regarded by the law as a sufficient consideration for the other's promise. Of course a promise which is merely illusory, such as an agreement to buy only what the promisor may choose to buy, falls short of being a consideration for the promisee's undertaking, and neither is bound. El Dorado Ice & Planing Mill Co. v. Kinard, 96 Ark. 184, 131 S.W. 460; Williston, § 104. If, however, each party's binding duty of performance amounts to a valuable consideration the courts do not insist that the bargain be precisely as favorable to one side as to the other."

Furthermore, if any oral contract existed here, it was a unilateral contract to which the doctrine of mutuality does not apply. 12 Am.Jur., Contracts, Sec. 14. Cf. Wentworth Military Academy v. Marshall, 1955, 225 Ark. 591, 283 S.W.2d 868. A unilateral contract is one in which one party thereto makes a promise in exchange for a future act or forbearance on the part of the other party, whereas under a bilateral contract wherein mutual promises are exchanged, the contract is binding immediately. Under a unilateral contract neither party is bound until the act or performance on the part of the promisee has been completed. Biscoe v. Deming Investment Co., 1921, 148 Ark. 525, 230 S.W. 592; Restatement, Contracts, Sec. 52. See also Abbott v. Arkansas Utilities Co., 8 Cir., 1948, 165 F.2d 339.

As the court has found in this instance, Bellinger, as agent for the defendants, advised Crawford to the effect that if Crawford would give all of his business to the defendants, the defendants would "stick by him" so long as

298

Crawford continued to do all of his business with the defendants. It is clear that the oral communication, if it constitutes a contract at all, is a unilateral one since the "promise" on the part of the defendants was made not in exchange for a promise on the part of the plaintiffs, but in exchange for an act on their part, that is, in exchange for getting all of the plaintiffs' business. The court, therefore, concludes that the doctrine of mutuality is no defense to this oral contract, if it be a contract, and the fact that the plaintiffs were not bound to give all of their business to the defendants is therefore immaterial.

■ However, while the decisions of the Arkansas Supreme Court do not permit lack of mutuality as a defense, they require, as above shown, that a contract must nevertheless be based upon a valid consideration. In the case of a unilateral contract there is no binding obligation on the part of the promisor, in this case the defendants, unless and until the promisee has fully performed the act which forms the consideration for the promise. Until such act is fully performed, the alleged contract is not enforceable. In Biscoe v. Deming Investment Co., supra, the court at page 537 of 148 Ark., at page 596 of 230 S.W. said:

"The instrument which is the foundation of this action does not by its terms impose any obligation upon the appellee to render any service to the appellants in procuring the loan mentioned in the instrument. The contract is one purely unilateral, and it therefore can not be enforced unless the appellee performed the service which it was employed to render."

■ The plaintiffs' proof is that the defendants promised to "stick by" them if all of their business was given to the defendants. The undisputed fact is that the plaintiffs never at any time gave all of their financing to the defendants. Until after January 7, 1956, none of the new car floor planning at the Benton business was given to the defendants, and each of the businesses involved from time to time gave financing business to other finance companies, although a large portion of it did go to the defendants. It is, therefore, patent that the plaintiffs never performed the only act which can be construed as consideration for the alleged oral promise made by the defendants, and such alleged contract is therefore unenforceable if it· exists . at all.

■ Without going into detail, it may also be noted that a unilateral contract must be accepted by some unequivocal act or statement, and that no such act or statement was ever made by any of the plaintiffs. Furthermore, the plaintiffs tendered no performance. This has particular reference to the Hot Springs dealership since by reason of the termination shortly after its inception the plaintiffs had no opportunity to perform fully. In such instances both acceptance of the alleged unilateral contract and a tender of performance are necessary to the enforcement thereof. See generally, Restatement, Contracts, Secs. 55–58. Therefore no enforceable contract existed between the parties which would require the defendants to continue financing the plaintiffs.

■ Furthermore, even assuming that the plaintiffs had performed under the alleged oral contract, an analysis of the words used by Bellinger demonstrates that they are neither promissory in nature nor sufficiently definite in their terms to create a contract. In substance Bellinger advised Mr. H. T. Crawford that if Crawford would give all of his financing business to the defendants, the defendants would "stick by Crawford through thick and thin." It is difficult to construe such statements as being more than a mere prediction, and Crawford's own testimony that he relied principally upon Bellinger's assurances that personal service and advice would be available tends to further establish that Bellinger's statement was not promissory in nature. Be that as it may, however, a promise "to stick by" Crawford falls far short of a promise to

finance him for an indefinite time without regard to conditions and circumstances. There is nothing in the testimony which would aid the court in construing Bellinger's language. In the particular context it may be assumed that his alleged promise related in some manner to the mutual business between the parties, but there is no testimony which can make these vague and general words stand for an explicit promise to finance the plaintiffs indefinitely. The "promise" to "stick by" the plaintiffs might just as easily and more conceivably have related to the alleged promise to give advice and personal service. The court is unable to construe such obscure representations as a concrete promise for indefinite extension of credit.

Even if so construed, essential terms of the alleged oral contract are missing. Had Bellinger explicitly promised that the defendants would furnish financing, the terms of such arrangement would be still unestablished. There is nothing in the evidence to show what interest rates would be involved, what retail buyers would be acceptable credit risks, what arrangement for guarantees by the plaintiffs, if any, was made, the place where such sales contracts would be accepted or the time and manner of their satisfaction. Some of those essential terms might be derived from the subsequent written dealer protection agreement executed by the parties, but if that agreement is accepted as a guide to the terms of the alleged oral contract between the parties, the plaintiffs are confronted immediately with the fact that the dealer protection agreement clearly contemplates no obligation upon the part of the defendants to finance the plaintiffs in any of their businesses. In Ashley, D. & N. Ry. Co. v. Baggott & Boyd, 1916, 125 Ark. 1, at pages 3 and 4, 187 S.W. 649, the court said:

"Under the testimony of Boyd, Roy did not bind the railroad company to give the plaintiffs his repair work for any particular length of time, and it could not be shown that he would ever call upon them to do any repair work. The railroad company could do so or not as it pleased. Nor could it be shown that the parties would ever agree upon the price to be paid for the work. The testimony of Boyd himself brings the case squarely within the principles decided in Somers v. Musolf, 86 Ark. 97, 109 S.W. 1173. The contract is so indefinite that it is, incapable of being enforced. It is evident that courts neither specifically enforce contracts nor award substantial damages for their breach when they are wanting in certainty. Damages cannot be measured for the breach of an obligation when the nature and extent of the obligation is unknown, being neither certain nor capable of being made certain."

In Restatement, Contracts, Sec. 32, the rule is stated:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

Time, place and amount [1] are usually considered indispensable terms to a definite contract. In this instance, even assuming an explicit promise to finance—which did not exist—the essential terms of any such alleged oral contract are missing, and it is therefore unenforceable.

In addition to the foregoing, the court is also convinced that, except for the Hot Springs business, the plaintiffs would be barred in this instance under the parol evidence rule, since parol evidence may not be admitted to vary or contradict a subsequent written and integrated instrument. For a general discussion of this well-settled rule, see Comment, Scope and Operation of the Parol Evidence Rule in Arkansas, 4 Ark. L.Rev. 168 (1950). In the present case the oral statements made by Bellinger al-

---

1. In this case the "amount" relates to the interest rate.

leged by the plaintiffs to constitute contract were in each instance made prior to execution of the written Dealer Protection Agreement and as an inducement to Crawford and his associates to enter into that agreement. If Bellinger's statements are interpreted in accordance with the plaintiffs' contentions, they manifestly vary or contradict the subsequent written agreement. Therefore, if the Dealer Protection Agreement is an "integrated" contract, that is, if it embodies the terms of all the transactions between the parties in a "single memorial," then the evidence of an alleged oral contract preceding the written agreement is inadmissible.

Reference to the Dealer Protection Agreement shows that it does not expressly deal with the precise terms of the statements made by Bellinger. It does, however, provide "this agreement shall continue in force until notice of termination * * *," and refers to the plaintiffs' intention "to offer for sale to you [the defendants] from time to time notes, contracts, chattel mortgages (hereinafter called "notes") as may be acceptable to you * * *." Thus, the Dealer Protection Agreement at least impliedly covers the limitation of the defendants' obligation to purchase, and is at plain variance with any alleged oral promise to finance the plaintiffs indefinitely.

As Dean Wigmore has pointed out, in determining whether the terms of a subsequent written agreement include the matters dealt with in the prior oral agreement, "the chief and most satisfactory index for the judge is found in the circumstance whether or not the *particular element of the alleged extrinsic negotiation is dealt with at all* in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element * * *." 9 Wigmore, Evidence, Sec. 2430.

A similar situation arose in Young v. Westark Production Credit Ass'n, 1953, 222 Ark. 55, 257 S.W.2d 274. In that case Young gave a note and mortgage to Westark in a stated amount in return for a loan. Prior to the execution of the note and mortgage, Young had a conversation with Westark, as a result of which he understood that Westark would advance him various other sums at various times. Westark refused to make such advances, as a result of which Young took certain farm losses and was unable to pay the note. These facts were raised as a defense in a foreclosure suit brought by Westark. The note and mortgage did not on their face exclude the possibility of a separate promise on Westark's part to extend further credit, but the court said at page 61 of 222 Ark., at page 278 of 257 S.W.2d:

"The original loan for $6,400 was made October 27, 1950, and advances thereunder were made of $400 and $600 on December 6, 1950, and January 15, 1951, respectively. Although the Association was not bound by the original loan note or the mortgages given as security or by any other writing to make unlimited advances, or any advances to appellants, they again contend that the Association was bound to do so by oral promises of certain officials.

"Even if such promises had been made they could not bind the Association. The matter of extending credit involved questions of judgment and discretion, and parol evidence was not admissible to vary the written contract. See Zearing v. Crawford, McGregor & Camby Co., 102 Ark. 575, 145 S.W. 226, and Lane v. Smith, 179 Ark. 533, 17 S. W.2d 319."

In the case at bar the Dealer Protection Agreement does not explicitly provide that the defendants set limits to the plaintiffs' financing, but it does clearly negate the existence of any obligation on the part of either party to furnish or receive unlimited financing. It clearly indicates that the plaintiffs will "offer" paper to the defendants, but nowhere does it provide for any obligation on the part of the defendants to accept such

paper. The agreement in essence gives rise to no obligations on the part of either party until the defendants purchase paper from the plaintiffs. The agreement covers the mutual obligations which arise from the sale and purchase of such paper, but it, the agreement, does not contemplate any right on the part of the plaintiffs to insist upon such purchase. The court concludes that the parol evidence rule is an additional bar to plaintiffs' recovery, except as to the Hot Springs business, where no written contract was ever executed by both parties.

■ Finally, it may be noted that the plaintiffs have failed to establish that their damages were a result of the defendants' action. It may be assumed that the plaintiffs did in fact suffer some damages as a result of such action, although the court's conclusion set forth above eliminates the necessity for determining the amount. Nevertheless it should be pointed out that the plaintiffs' evidence falls far short of showing any more than nominal damage which was causally related to defendants' actions. The plaintiffs testified in general terms that they were "forced" to make sales of various properties on which they took losses in order to have sufficient capital to operate their businesses once financing was terminated. There is absolutely no testimony to indicate why such sales and losses were necessary except the general statement that more money was needed. Neither is there evidence of any substantial nature to indicate that the losses on the business operations themselves derived from lack of financing. On the contrary, there is abundant evidence casting doubt on such contentions. For example, H. T. Crawford testified that all the finance companies were willing to finance him within 90 days from the termination by the defendants. Yet, many of the sales of his property allegedly made to finance his operations himself occurred in 1957 and 1958. No explanation was offered as to why such sales were made after financing by other companies had been resumed. Immediately after the defendants' termination

of financing, Mr. H. T. Crawford was able to obtain financing at the Benton business with Murdock Acceptance Corporation. He testified that prior to that time he had been selling 80 to 90 cars per month at that business. In spite of that fact, however, his offerings of paper to Murdock, summarized in the court's findings of fact, show that in some months as few as seven instruments representing cars sold and needing finance were presented to Murdock. This undisputed fact was never explained in any way, notwithstanding Crawford's contention that had financing been available, he could have continued to sell as many as 80 or 90 cars per month. The profit and loss statements introduced in evidence as to the Benton business further show that cost of operation rose considerably in 1956 on almost all levels, although actual sales were down considerably. This evidence also remained unexplained.

The court has concluded that the plaintiffs have failed to sustain their burden of proof that their damages resulted from the defendants' action, and therefore even had a valid and enforceable contract existed between the parties, the plaintiffs would not be entitled to recover damages.

The defendants have raised several other defenses to the plaintiffs' contentions relative to the alleged oral contract. However, any one of the foregoing defenses is dispositive of the plaintiffs' contentions in that respect, and what has already been said should be sufficient to show the total lack of any basis for the plaintiffs' position in that regard.

■ The plaintiffs' second contention is also based upon an alleged oral contract which purported to bind the defendants (1) to notify the plaintiff dealers immediately or as soon as practicable when an account became delinquent, and (2) to repossess, as soon as possible, automobiles upon which payments were overdue. For the purposes of this opinion the court will ignore the inconsistencies of these contentions with those which follow. The plaintiffs claim to

have been damaged by reason of the alleged breach of this agreement because had they been notified of delinquent accounts as soon as possible, they would have, in at least some instances, been able personally to interview the debtor and bring him up to date in his payments. By so doing, they would have been able to avoid their guaranty in the Dealer Protection Agreement to repurchase the automobiles upon which payments had become delinquent. It is also the plaintiffs' contention that the defendants were obligated, notwithstanding the 90-day period provided for in the Dealer Protection Agreement, to repossess automobiles immediately after payments became overdue. In this connection the plaintiffs claim damages by reason of the defendants' failure to make repossessions promptly and contend that when repossessed (and subsequently repurchased by the plaintiffs as required in the Dealer Protection Agreement), the automobiles had lost value which would not have been lost had the repossession been prompt.

The only testimony which supports the contention that this agreement was made is the simple conclusion of law asserted by the plaintiffs that they "had an agreement" to the above effect. There was no testimony as to when such an agreement was made, where it was made, who was present, parties making that agreement, which plaintiffs were included therein, or any other terms. The court has concluded in its findings that such an agreement was never made, and it is therefore unnecessary to determine whether the defendants' actions were inconsistent with such an alleged agreement.

■ At this point the plaintiffs present their third contention, which is a related but novel assertion. It is their contention that the terms of the written contracts executed by the parties requiring the plaintiffs to repurchase cars upon which payments had become delinquent is invalid as in conflict with the Arkansas law. From this, they apparently would conclude that they are entitled to recover on amounts paid by them for the repurchase of such automobiles. Without going into side issues of estoppel, it will be sufficient to point out that the plaintiffs' argument in this respect is not well founded. In essence, they assert that under the Arkansas decisions the vendor on a conditional sale has several remedies upon default of the purchaser. He may have an action of replevin, he may sue to recover the balance of the purchase price, or he may peaceably repossess without process. See generally, Anderson and Hale, Conditional Sales in Arkansas, 4 Ark.L.Rev. 19 (1949). It is settled by the decisions of the Arkansas Supreme Court that the pursuit of one of these remedies is an election and precludes the pursuit of any other remedy. Therefore, neither the plaintiffs as the original sellers nor the defendants as the assignees of the conditional sales contracts could repossess and also sue for the purchase price. The plaintiffs argue from this settled principle that once the defendants repossessed automobiles, they could not compel the plaintiffs to repurchase the automobile for the balance of the purchase price due in spite of the plaintiffs' contractual obligation to do so under the Dealer Protection Agreement. There can be no argument about the plaintiffs' proposition that a seller cannot retake the automobile and then sue for the balance of the purchase price, but the plaintiffs' further argument that repossession of an automobile by the defendants forgives the debt of the purchaser under the sales contract and also the obligation of the seller under the Dealer Protection Agreement is not supported by the citation of any authority.

■ The defendants, in repossessing the automobiles from the original purchasers, clearly had no further right against those purchasers, but the election of remedies against the purchasers has no bearing whatever upon the plaintiffs' contractual obligation to repurchase the vehicles for the balance of the purchase price. The effect of such obligation is to make the plaintiff dealers guarantors of the original notes. There is no reason to invalidate a contractual

obligation because the defendants have elected a remedy against third parties. Cf., Tanner v. Johnson, 1915, 119 Ark. 506, 178 S.W. 376. The rule is stated in 28 C.J.S. Election of Remedies § 8:

"Necessity of privity. The doctrine of election of remedies does not apply to the pursuit of distinct causes of action arising out of independent transactions with different persons. So the doctrine of election cannot be applied between one of the parties to a contract and a third person, a stranger thereto, since it is applicable only to the parties to the contract. Where a seller in a conditional sale brings replevin against a purchaser from the conditional purchaser and judgment is rendered in favor of defendant, it is not such an election of remedies as will prevent a suit on the purchase-money note, for the reason that there is no privity of contract between those liable on the note and the party sued in replevin."

 The defendants' right to insist upon the terms of its contract with the plaintiff dealers is not in any way mitigated by whatever election of remedies it may have exercised as to the original purchaser. The court, therefore, concludes that the Dealer Protection Agreement is valid in requiring the repurchase of the automobiles by the plaintiffs after the repossession of the automobiles from the original purchasers by the defendants.

 The plaintiffs' fourth contention is that the conditional sales contracts and accompanying notes were usurious, and that the Dealer Protection Agreement in setting up a reserve, in effect as a guarantee for the payment of the notes, is likewise usurious. From this proposition the plaintiffs reason that the Dealer Protection Agreements were illegal, and that "they are entitled to recover from the defendants all payments they have made to G.C.C. [General] on the usurious contracts of sale assigned to G.C.C., in each case where they have

been required to make good purchaser's default." At the trial the court advised the parties that before considering the issue of whether there was actually usury involved, the issue would be first submitted and decided as to whether the plaintiffs, as the payees of the notes, are entitled to claim usury in this case. It is the contention of the defendants that the plaintiffs, as the payees on the allegedly usurious notes, were themselves usurers and not the defendants. However, it has been settled by the Supreme Court of Arkansas that where, as here, the finance company provided the forms, set the rates, furnished the rate tables, and otherwise explicitly directed the procedure for preparing conditional sales contracts and notes which would be acceptable to it, the finance company itself may be guilty of usury. Schuck v. Murdock Acceptance Corp., 1952, 220 Ark. 56, 247 S.W.2d 1. If the contracts here are usurious, the defendant finance company is liable to the legal penalties therefor as much as the plaintiff dealers who are the original payees on the allegedly usurious notes.

 But this rule does not render the defendants liable to the plaintiffs, who are equally guilty of usury, if any there be. The old rule that "usury is a personal defense," Hiner v. Whitlow, 1899, 66 Ark. 121, 49 S.W. 353, 74 Am. St.Rep. 74, has dubious standing today. See Bailey v. Commerce Union Bank, 1954, 223 Ark. 686, 269 S.W.2d 314 (original opinion). That doctrine allowed lenders to make loans to straw men, and the real borrower would then assume the obligation of the straw man. The rule today, so far as Arkansas law is concerned, does not permit the use of straw men either as borrowers or lenders for the purpose of evading usury laws. See generally, Collins and Ham, The Usury Law of Arkansas: A Study in Evasion, 8 Ark.L.Rev. 399 (1954); Schuck v. Murdock Acceptance Corp., supra; Bailey v. Commerce Union Bank, supra.

The doctrine of "personal defense," however, must be distinguished from the

defendants' contention here. That contention is simply that the lender himself cannot take advantage of his own turpitude. Stated conversely, the laws of usury are for protection of the borrower, and while the courts may pierce any veil of sham to protect the borrower, there is no protection afforded to the usurious lender.

 The decisions attest the merit of the defendants' contention in this regard. In 91 C.J.S. Usury § 73, the general rule is stated:

"The policy of the usury laws will not permit the usurer to set up his own usury to avoid his agreement. He cannot set up his own turpitude to his advantage."

This rule is in accord with the purpose of usury laws "to protect the needy and necessitous from the oppression of usurers eager to take advantage of the distresses of others * * *." 55 Am.Jur., Usury, Sec. 101.

The general rule set out above is supported by the decisions of the Supreme Court of Arkansas. In Ford v. Hancock, 1880, 36 Ark. 248, at page 252 the court said:

"Laws against usury are for the protection of the borrower only, who is regarded as the victim of oppression; and a contract tainted with usury can be avoided but by him or his privies."

In Standard Motors Finance Company v. Mitchell Auto Company, 1927, 173 Ark. 875, 293 S.W. 1026, 57 A.L.R. 877, an automobile dealer, with financing arrangements similar to those involved here, negotiated his paper to the finance company without complying with their agreement that a certain down payment should be made in each instance. When the finance company discovered this fact, it brought suit to rescind certain of the notes. The dealer contended that the notes assigned to the finance company were usurious and that the finance company therefore did not come into court with clean hands in seeking rescission. The court first noted that the notes were not usurious, and then further held at page 879 of 173 Ark., at page 1028 of 293 S.W.:

"The second answer is that the usury law is for the protection of the borrower, and he alone can make that defense. Ford v. Hancock, 36 Ark. 248. The notes in question were indorsed by appellees without recourse on them, and the makers of these notes are not parties to this litigation."

 Usury is "a corrupt agreement for more than the legal rate of interest on a loan of money, or the forbearance of a debt," Ford v. Hancock, supra; or stated more simply, usury "consists in contracting for payment of interest greater than the law allows." Blalock v. Blalock, 1956, 226 Ark. 75, 288 S.W.2d 327, 329. The plaintiffs, therefore, were clearly guilty of usury, if there was any, in taking the notes and conditional sales contracts or in assisting in any alleged scheme to evade the usury laws, even though, as to the borrowers, the defendants might be equally guilty.

 The plaintiffs seek to avoid the inevitable effect of these rules by arguing that the payments they made under their guaranty obligation in the Dealer Protection Agreement were exacted under duress. This claim is founded upon the assertion that the plaintiffs' financing would be cut off if such payments were not made. In the first place, even if this constitutes duress, the relevancy of the assertion is dubious. In the second place, it is clear that the plaintiffs were never obligated to finance their businesses through the defendants either before signing the Dealer Protection Agreement or afterward. They were at all times parties to the usury which they alleged was practiced upon the unsuspecting purchasers of automobiles, and they fall clearly within the rule in the Standard Motors case, supra.

Assuming the notes and the Dealer Protection Agreement to be usurious or to provide a scheme for fostering usury, the plaintiffs are nevertheless prevented

from so asserting in this action. It will therefore be unnecessary to hold a further hearing for a determination of whether or not usury is actually involved in these contracts, since it cannot be taken advantage of by the plaintiffs.

The plaintiffs' final contention is that in some manner they were slandered by statements made by Bellinger. They do not specify the words they rely upon as the basis for this assertion. There was testimony that Bellinger advised some of the witnesses that the defendants were withdrawing financing because of pressure from other car dealers in Hot Springs. These statements, if untrue, might give rise to some action by the Hot Springs car dealers so accused. They hardly reflect ill upon the plaintiffs, however, and the court does not understand their contention to be that the mere information of withdrawal was slanderous.

Bellinger also advised one witness not to go to work for Crawford, implying that Crawford would soon be out of business. However, there is no testimony that the plaintiff sustained any damages by virtue of this statement.

The plaintiffs' principal contention stems from the testimony of A. C. Stone, Vice President of the Elk Horn Bank and Trust Company. Mr. Stone testified by affidavit:

"Later a Mr. Bellinger, who said he was the office manager of General Contract Corporation in Hot Springs, Ark., called me and said he only wanted to check some motor numbers on the warehouse receipts that we held, to see if we did not have the warehouse receipts, or mortgage on some of the vehicles that they had title to. We checked or compared these motor numbers; and *none* of the motor numbers that he gave me were covered in our warehouse receipts, and we found everything to be regular. But during these three conversations I was definitely lead to believe that Mr.

Crawford was either dis-honest or was having serious financial difficulties."

Thereafter, the Elk Horn Bank made only one loan to Crawford.

The defendants in their brief assert that slander was not properly pleaded and state that, if considered by the court as a part of the plaintiffs' claims, defendants should be allowed to amend their answers to assert the applicable statute of limitations. Ark. Stat.Ann. § 37–201 (1947), provides for a one-year limitation period on actions for slander, which would bar this action so far as it might proceed upon a claim of slander. The court concurs that slander was never properly pleaded, although the plaintiffs did allege in their complaint that malicious "inquiries" were made about them which damaged their financial arrangements. The defendants have not tendered an amendment to their answer to include the defense of limitations. Under these circumstances, though the defense presented by way of brief might justify the court's consideration of it, the court feels that the issue should be disposed of upon the merits.

Slanders which damage credit, of course, are actionable. It is doubtful that the inquiries instituted by Bellinger were slanderous, but for the purpose of this opinion, it may be assumed that they were, because it is apparent that his inquiries were qualifiedly privileged.

Neither the plaintiffs nor defendants cite any cases touching upon slander, and the court's investigation has not revealed any decision of the Supreme Court of Arkansas precisely on point. It is, however, well recognized that a qualified privilege exists in these circumstances. In Braman and the Gus Blass Co. v. Walthall, 1949, 215 Ark. 582, at page 589, 225 S.W.2d 342, at page 346, the court quoting in part from Newell, Slander and Libel, said:

"A defamatory communication when necessary to protect one's own interest is privileged, when made to

**306**

persons who also have a duty or interest in respect to the matter."

Sometimes a similar rule for privilege is provided for when, aside from personal interest, there is a legal or moral duty to carry out. In Kroger Grocery & Baking Co. v. Yount, 8 Cir., 1933, 66 F.2d 700, at page 702, the court, through Judge Gardner, stated such a rule:

"A communication made in good faith by any person in the discharge of his duty, either legal or moral, is qualifiedly privileged and actionable only on proof of actual malice. Western Union Telegraph Co. v. Brown, 8 Cir., 294 F. 167, 169; Stroud v. Harris, 8 Cir., 5 F.2d 25; Wise v. Brotherhood of Locomotive Firemen, etc., 8 Cir., 252 F. 961 * * *."

In Bohlinger v. Germania Life Ins. Co., 1911, 100 Ark. 477, 140 S.W. 257, 36 L.R.A.,N.S., 449, a life insurance company commissioned a credit agency to report upon an applicant for insurance. The report was admittedly libelous. It was mailed by the insurance company to its examining physician and its local agents. The court said at pages 482–484 of 100 Ark., at page 259 of 140 S.W.:

"A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest, or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable * * *.

"All of the statements contained in the report affected the plaintiff as an insurance risk."

See also Erber & Strickler v. R. G. Dun & Co., C.C.E.D.Ark.1882, 12 F. 526 (dealing with credit report).

These rules are in accord with the general course of decisions giving the protection of a qualified privilege to reports of credit agencies, communications between creditors, and similar statements. See 33 Am.Jur., Libel and Slander, Secs. 170–172; 53 C.J.S., Libel and Slander §§ 109, 115, 119; Annotation 30 A.L.R.2d 776 (credit reports); Annotation Ann.Cas.1915B, 132 (communications between creditors).

In Smith Bros. & Co. v. W. C. Agee & Co., 1912, 178 Ala. 627, 59 So. 647, Ann. Cas.1915B, 129, slanderous statements were made at a meeting of creditors by the defendant. Repeating the rule announced by the Supreme Court of Arkansas as above quoted, the court added at page 635 of 178 Ala., at page 649 of 59 So., at page 132 of Ann.Cas.1915B:

"The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken."

In Erber & Strickler v. R. G. Dun & Co., supra, at page 536 of 12 F., the court quoted with approval from Ormsby v. Douglass, 37 N.Y. 477:

"Upon the same general principle merchants have an interest in knowing, and have a right to know, the character of their dealers and those who propose to deal with them, and of those upon whose standing and responsibility they, in the course of their business, have occasion to rely.

"*As a necessary consequence, they may make inquiries of other merchants, or of any person who may have information;* and if such merchant or other person, in good faith, communicates the information which he has, or thinks he has, the communication is privileged." (Emphasis added.)

The investigation of debtors, business associates, and employees is itself a big business, and business activity as we know it is today largely based upon such

investigations.[2] It could hardly seem strange to any officer of a bank to find such investigations being made, and it could hardly be surprising to a borrower that his creditor makes such inquiries. The judicial expressions, though set out in somewhat different terms, are cognizant of such business necessities, and implicit in the doctrine of qualified privilege for confidential communications between businessmen mutually interested in special information is the design to meet those demands.

 The court believes that in the instant case the communication made by Bellinger by inquiring of the bank officer whether any motor numbers were duplicated was well within the privilege granted to information exchanged between mutual creditors and those who have a mutual interest. The privilege does not exist if malice is present, but, though malice is alleged, neither the communication itself nor independent proof substantiates such a charge in the slightest degree. Neither did the inquiry made by Bellinger exceed the privilege.

 The court does not understand the plaintiffs to claim slander as a result of Bellinger's statement to plaintiff Crawford's prospective employee that Crawford would soon be out of business; but it might be noted that a similar privilege would probably protect that communication as well. Certainly Bellinger had a "moral" or "social" duty to advise one who seeks that advice that a prospective employer might be unsatisfactory. An employee has as much right to investigate his prospective employer as an employer has to check his employee. Answers given to this kind of inquiry are as fully protected as answers given in credit reports upon employees. There was no slander.

### Conclusions of Law

**1.**

The court has jurisdiction of the parties and the subject matter of this action.

**2.**

No valid or enforceable oral contract existed between the parties at any time.

**3.**

The Dealer Protection Agreement executed by the parties is valid and does not contravene the laws of Arkansas.

**4.**

If the Dealer Protection Agreement is a scheme for usury or if the paper assigned to defendants was usurious, the plaintiffs are not entitled to assert such claim because they are parties to the alleged usury.

**5.**

The defendants did not slander the plaintiffs or any of them.

**6.**

The plaintiffs are entitled to have and recover nothing of and from the defendants or either of them, and the complaint of the plaintiffs should be dismissed.

An order in accordance herewith is being entered today.

---

2 Judicial notice may be taken of such business practices. 20 Am.Jur., Evidence, Sec. 110.